[Civ. No. 177. Fifth Dist. Feb. 28, 1963.]

AUTOMATIC POULTRY FEEDER COMPANY, Plaintiff and Appellant, v. ROBERT J. WEDEL, Defendant and Respondent.

ROBERT J. WEDEL, Plaintiff and Respondent, v. AUTO-MATIC POULTRY FEEDER COMPANY et al., Defendants and Appellants.

(Consolidated Cases.)

510

Taylor & Taylor and Edward T. Taylor, Jr., for Plaintiff and Appellant and Defendants and Appellants.

William Frank Roberts for Defendant and Respondent and Plaintiff and Respondent.

CONLEY, P. J.—The judgment appealed from in consoli-

dated cases centers about the delivery by Automatic Poultry Feeder Company, a corporation, to Mr. and Mrs. Wedel of certain feeding machinery for use on their poultry farm near Groveland. Robert J. Wedel, in turn sued the Automatic Poultry Feeder Company and its agent, Paul Ter Avest, for damages allegedly caused by the failure of the machinery to perform in accordance with the warranty of suitability, thereby causing the death of several thousand turkeys and the loss to Mr. Wedel of a bonus promised him under certain contingencies by General Mills Company. All of the turkeys in two flocks on the Wedel farm were owned by General Mills Company; Mr. Wedel had a written contract with that company under which he would receive progress payments at fixed stages of growth of the turkeys and a bonus of 10 cents a head for all birds actually brought to maturity and sold, if the loss by death and culling of the two flocks should prove to be less in the aggregate than 10 per cent of the total poults delivered to him for raising.

The trial court allowed Automatic Poultry Feeder Company nothing on its claim for the reasonable value of the machinery on the ground that it was useless for the purpose for which it was sold. The court's findings on this subject are: ". . . that the reasonable value of the merchandise so supplied to defendants was nil, the said merchandise being unsuitable for the purpose for which it was sold and installed; further, that defendants' acquiescence in the account was conditioned upon four conditions, none of which were met by plaintiff." While the appeal is from the entire judgment, appellants' brief urges no claim of error with respect to the denial of relief on the company's complaint; we shall not look for errors where none were found by appellants' attorneys and will affirm this portion of the decision.

We turn to the award made on the claim urged by Mr. Wedel against the machinery company and its agent, Paul Ter Avest. As the turkeys were owned by General Mills, the plaintiff sued only for loss of his profits in the form of a bonus which he alleges he would have received except for the breach of warranty. The turkey growing contract, dated September 12, 1960, between General Mills, Inc., and Robert J. Wedel and Aline C. Wedel, his wife, provided that General Mills should deliver to the growers' ranch ". . . approximately 40,000 poults, plus feed and medication supplies necessary to raise these turkeys to market"; that General Mills should

advance the grower 10 cents per poult at the time of placement to be deducted from intermediate or final advances; that General Mills should pay "... three (3) cents per pound live weight per saleable hen turkey and two (2) cents per pound live weight per saleable tom turkey when processed." Paragraph 6 of the contract reads as follows:

"General Mills shall, at the close of *all* projects covered by this contract on Grower's ranch, pay an additional ten (10) cents per saleable tom or hen turkey if mortality for all flocks was ten (10) per cent or below. This will be for total over-all mortality and shall not apply on separate flock mortality. Mortality will be determined on basis of total number placed less the number processed; ..."

It will be unnecessary to reproduce all of the complex and well thought out provisions of the agreement, which consists of five typewritten pages and 31 numbered paragraphs. The inference that this was a standard agreement used in the widespread turkey growing business of General Mills may be deduced from the fact that on the first page at the top right-hand corner is the statement as to the form used: "Revised August 1, 1960." It will be sufficient here to note that by the terms of the contract title to all turkeys remained in General Mills, and that if the grower should fail to carry out or abide by the agreement or should, through negligence or otherwise, adversely affect the equity of General Mills, the latter could terminate the contract and take over the flocks as well as the premises and equipment for completing the growing operation.

Appellants concede that there is substantial evidence to support the finding of the trial court that the machinery installed by appellants upon respondent's ranch was improperly designed in that the lip of the feeding cans was too large, thus causing the destruction of a portion of respondent's turkeys by starvation. The trial court in its memorandum of opinion says that:

"The total flocks aggregated 51,505, less a normal mortality of 4,528, or a net 46,977 birds which would have been marketed, but for the misfortune of the defective installation. Upon this amount plaintiff would have been entitled to a bonus of 10 cents per bird, or $4,697.70. For this amount plaintiff is entitled to judgment, ..."

But appellants claim that "... at least two errors of law were made by the trial court, ... which make reversal of the

judgment necessary.'' Their first contention is centered upon section 3355 of the Civil Code:

''Where certain property has a peculiar value to a person recovering damages for deprivation thereof, or injury thereto, that may be deemed to be its value against one who had notice thereof before incurring a liability to damages in respect thereof, or against a willful wrongdoer.''

This code section apparently refers to the value of specific property involved in litigation rather than to business profits or a bonus. It has been applied to an owner's special valuation of a race horse (*Drinkhouse* v. *Van Ness*, 202 Cal. 359 [260 P. 869]), an uncommon variety of sweetpea seeds (*Zvolanek* v. *Bodger Seeds, Ltd.*, 5 Cal.App.2d 106 [42 P.2d 92]), an unusual Hereford cow (*King* v. *Karpe*, 170 Cal.App.2d 344 [338 P.2d 979]), and it would seem that the section in its literal meaning does not apply to this case. However, the general principle embraced in the section does find application to the situation presented by the record, because the plaintiff is not suing for what would normally be considered general damages but only for what would usually be termed special damages, that is to say, his loss of profits or bonus, and it is a general rule with respect to a claim for special damages arising from circumstances peculiar to the particular case that notice of such special factors must be communicated to or known by the other party at the time the contract is made in order to hold him liable therefor. In this connection the early case of *Wallace* v. *Ah Sam*, 71 Cal. 197, 200 [12 P. 46, 60 Am. Rep. 534], adopted the rule of *Hadley* v. *Baxendale*, 26 Eng. L. & Eq. 398, requiring as a condition to the recovery of special damages that:

'' '. . . if the special circumstances under which the contract was actually made were communicated by the plaintiff to the defendant, and thus known to both parties, the damage resulting from the breach of such a contract which they would reasonably contemplate would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated.

'' 'But, on the other hand, if those special circumstances were wholly unknown to the party breaking the contract, he at the most could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances for such a breach of his contract.' ''

The general rule contained in section 330 of the Restatement of Contracts at page 509 is as follows: "In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown specifically that the defendant had reason to know the facts and to foresee the injury."

The comment continues: "a. One who has committed a breach of contract is bound to pay damages only for such injury as he had reason to foresee when he made the contract." (See also 15 Am.Jur., Damages, 53, pp. 456-458; 5 Williston on Contracts (rev.ed., Williston & Thompson) § 1347, pp. 3783-3786; 3 Williston on Sales (rev.ed.) §§ 599b-599d, pp. 298-304.)

The record shows that the defendant company through its agents knew of the existence of the contract between Mr. Wedel and General Mills, but there is not sufficient evidence to prove that the machinery company had notice or knowledge of the provisions of the agreement relating to the bonus. It may be that a retrial of the case will show such knowledge on the part of the machinery company, but the present record does not support an inference that the company had notice of the bonus provision.

The second point made by appellants is that the court did not have a sufficient basis for making its finding of damages. This contention is divided into two parts, which lead to the same result: first, the evidence was not sufficiently certain to permit a specific finding of damage; second, the record does not show that the breach of warranty by the machinery company and the consequent death of certain turkeys was the proximate cause of the loss of the bonus by Mr. Wedel. Both contentions are based on the admitted fact that the second flock had not been wholly marketed before the cases were filed, or even at the time of trial, and that consequently it was impossible to know with reasonable certainty what was the total number of birds actually sold in the two flocks or the number of deaths, or whether the failure to earn the bonus was due to some combination of factors other than the failure of the machinery company to comply with its warranty of fitness.

The record shows that there were 23,505 turkey poults delivered to Mr. Wedel in the first lot and something over 28,000

in the second, making a total of more than 51,505. The figure 28,000 adopted by the court as the size of the second flock was not coincidental with the testimony of Mr. Wedel himself who said that the size of the second flock was ". . . 28,000—some odd hundred, I can't give it to you to the bird." In the first flock 7,244 birds died, of which 4,900 were lost as a result of the breach of warranty by the machinery company. In the first and second flocks there were 4,528 deaths from so-called "normal causes" up to a certain date, but it is admitted that the second lot of turkeys was not wholly sold at the time of the trial and that consequently the number of birds marketed and the number of birds which may have died up to that point were not in evidence. Mr. Wedel admitted on the stand that turkey raising is a hazardous occupation, the birds being subject to various diseases and other causes of death which could wipe out a substantial portion of a flock in a short time. The court therefore placed itself in the position of speculating that there would not be any additional mortality in the flock and that the birds would be marketed in a number that corresponded only to a partial experience with the second flock.

Let us suppose that on the date for ascertaining whether or not a bonus should be paid there had been an accumulation of additional deaths among the turkeys as a result of "normal causes," or fire, flood, disease, or additional negligence on the part of someone other than the machinery company, and that as a result the deaths added to the cull turkeys as provided by the contract would have exceeded 10 per cent by themselves, irrespective of the loss of birds caused by the failure to comply with the warranty; the result would have been, logically, that the breach of contract by the machinery company was not the proximate cause of the loss of the bonus; for it would have been lost anyway, irrespective of the breach of warranty.

 The well-known general rule on the subject of proximate cause is thus stated in 14 California Jurisprudence 2d, Damages, section 28, pages 657-658: "To sustain a recovery of compensatory damages for a breach of contract, a proximate or causal connection must exist between the breach of the contract and the detriment thereby inflicted on the plaintiff. This requirement is recognized by statute, and, accordingly, the general measure of damages for a breach of contract is stated by the Civil Code to be the amount that will compensate the party aggrieved by the breach for all of the detriment proximately caused thereby, or which, in the ordinary course

of events, would be likely to result therefrom. Under this rule, the damages sought by the plaintiff must immediately follow the breach and be the result thereof, since causes which are merely incidental, or which are the instruments of some other controlling agency, are not deemed to be proximate causes within the purview of the law. The application of the rule depends on the facts of each particular case; and the mere fact that the damage of which the plaintiff complains is contemporaneous with a breach of contract, or that such damage takes place after the breach, will not, in itself, afford a sufficient basis for concluding that it is proximately caused thereby.''

 With respect to the requirement that damages must be proven with reasonable certainty, 15 American Jurisprudence, Damages, section 20, pages 410-412, states: ''The damages recoverable in any case must be susceptible of ascertainment with a reasonable degree of certainty, or, as the rule is sometimes stated, must be certain both in their nature and in respect of the cause from which they proceed. Damages which are uncertain, contingent, or speculative cannot be recovered either in actions ex contractu or actions ex delicto. As between possible methods by which a loss may be computed, the law prefers that which leads to certain, and not speculative, results. A reason given for the rule is that uncertain or speculative damages are not susceptible of the exactness of proof that is required to fix a liability. It is entirely distinct from and independent of the rule that the damages recoverable must be the natural and proximate results of the wrong complained of and, in actions ex contractu, such as may fairly be supposed to have entered into the contemplation of the parties when the contract was made—that is, such as might naturally be expected to follow its violation.''

The findings of the trial court relative to the damages are as follows: ''. . . however, as to loss of profits and bonuses suffered by said plaintiff, in connection with his contract with General Mills, plaintiff would be entitled to a bonus of 10¢ per bird if the mortality rate did not exceed 10% for both flocks together. Plaintiff sustained an immediate loss of 4,900 poults (or more than 20%) of the first batch of turkeys—this loss was due to the unsuitability of the product for the purpose for which it was sold. The remaining loss of 2,344 birds, out of the 23,505 delivered to plaintiff by General Mills, constituted slightly less than 10% of the delivered number. The second batch of birds was in excess of 28,000, and a nor-

mal mortality therefrom (well established as a matter of common knowledge), by testimony, indicated this to be 7.8% of the second flock, or equal to 2,184 birds—this added to the normal number from the first flock, 2,344, makes a total of 4,528 birds. Both flocks totalled 51,505 birds, and less a normal mortality of 4,528 from both flocks, the rate would have been less than 10%—the contract in question with General Mills awarded plaintiff a bonus of [10¢] per bird if the mortality rate did not exceed 10% for both flocks—therefore, but for the defective installation and breach of warranty on the part of defendants, plaintiff would have been entitled to a bonus of $4,697.70 (10¢ per bird) computed on the net 46,977 birds which would have been marketed.''

 With respect to the first flock of turkeys, the evidence supports the findings. But as to the second lot, the findings are only partly supported by the evidence. The court's statement that ''a normal mortality'' of turkeys is ''well established as a matter of common knowledge'' is an assumption that is unjustified, for courts obviously cannot take judicial notice of the alleged normal mortality of turkeys. The proof must support the legal conclusions of the court, and the proof does not do so in this case.

 The court's statement in the findings that the testimony ''indicated'' that the normal death of turkeys in the second flock was 7.8 per cent is accurate only to the date shown in the partial record of death in the second flock; this testimony did not purport to cover the time elapsing to the date of trial, and it took no account of the deaths that might ''normally'' or otherwise occur from that time to whatever prospective day (unfixed in the evidence) might be the date of the sale of the balance of the birds in the second flock.

A witness for the plaintiff testified that normal mortality in a turkey flock was from 7 to 15 per cent, and Mr. Wedel himself said that he would ''guess'' that normal mortality in a turkey flock would run ''. . . from seven to twelve, fourteen per cent, anywhere in there.'' If normal mortality in a turkey flock would run as strongly as both Mr. Wedel and opposing witnesses indicated, there could be no reasonable certainty that the ''normal mortality'' itself would not add up to more than 10 per cent of the total of the two flocks, and in such circumstances the negligence of the machinery company and its failure to furnish a feeding machine in accordance

with the warranty would not be the proximate cause of the damage complained of by Mr. Wedel.

The judgment against Paul Ter Avest is patently erroneous. He was the agent of a disclosed principal and a judgment against him based on the contract of his employer is unjustified. (*Hayman* v. *Shoemaker*, 203 Cal.App.2d 140, 159 [21 Cal.Rptr. 519]; *Oppenheimer* v. *General Cable Corp.*, 143 Cal.App.2d 293, 297 [300 P.2d 151]; *La Rosa* v. *Glaze*, 18 Cal.App.2d 354, 357 [63 P.2d 1181]; *Marks* v. *Jos. H. Rucker & Co.*, 53 Cal.App. 568 [200 P. 655]; *Carlesimo* v. *Schwebel*, 87 Cal.App.2d 482, 487 [197 P.2d 167].)

For the foregoing reasons, the judgment is reversed as to Paul Ter Avest and is reversed only as to damages awarded Robert J. Wedel against Automatic Poultry Feeder Company and affirmed in all other respects.

Brown (R.M.), J., and Stone, J., concurred.