[Civ. No. 10904. Third Dist. Aug. 3, 1965.]

R. W. BAYUK et al., Plaintiffs and Respondents, v. JACK A. EDSON et al., Defendants and Appellants.

Jones & Reeder, Stanley C. Jones, Jr., Lillick, Geary, Wheat, Adams & Charles, Graydon S. Staring, Peter N. Swan and J. Anthony Giacomini for Defendants and Appellants.

Hurley & Bigler and David C. Rust for Plaintiffs and Respondents.

PIERCE, P. J.—Plaintiffs, R. W. Bayuk and Cressa Bayuk, husband and wife, sued defendants, Jack A. Edson and Robert L. Bosworth, for alleged negligence in the performance of an oral contract for architectural services in connection with the construction of plaintiffs' home. After a court trial plaintiffs recovered judgment against defendants for $18,500, with interest and costs.[1]

The complaint pleaded, and the court found, both faulty design and supervision proximately causing damage. Defendants' arguments on appeal do not challenge the finding of faulty design nor the fact that some damage was sustained by the Bayuks thereby. Defendant Bosworth contends that there was no breach of the obligation of supervision which he had assumed and that he was not personally liable anyway because he was acting as an agent for a disclosed principal. Defendant Edson contends that Bosworth had neither actual nor ostensible authority to assume any obligation to supervise construction. Both defendants contend that the amount of the court's award of damages is unsupported by substantial evidence and that the method of measurement thereof was

---

[1] A cause of action pleaded against Cummins, the contractor who built the home, resulted in a judgment for the contractor. That judgment is not appealed from.

improper. They further contend that the action is barred by the statute of limitations. (Code Civ. Proc., § 339.)

In the summer of 1959 plaintiffs sought the services of defendant Jack A. Edson, an architect, with offices at Medford, Oregon. By telephone Dr. Bayuk informed Edson that he contemplated building a home in Yreka but could not pay the standard architect's fees for design, plans, specifications and supervision. A meeting was arranged and Edson visited the Bayuks in Yreka. He brought Bosworth with him, introducing him as an architect "out of his office." An oral contract was the product of this meeting. By its terms Edson and Bosworth agreed to design and prepare working drawings and specifications for a ranch-type home costing approximately $35,000. The architect's fee was to be $2,000, and it was expressly understood the contract did not include supervision. Edson had urged Bayuk to contract for supervision at an additional fee but Bayuk told him that he could not afford it. It was understood that most of the actual work would be done by Bosworth but Edson expressly agreed to check and approve his work.

Unknown to the Bayuks, Bosworth was not in the employ of Edson; in fact, he was not a licensed architect. He had had, however, considerable training as an architect and was an assistant professor at the University of Oregon.

Edson and Bosworth agreed between themselves as to the sharing of the fee to be paid by the Bayuks; a somewhat vague understanding that it would be shared in proportion to the quantity of work done by each. Of the first payment of $1,000 Edson actually received $300 and Bosworth $700. A second installment of $1,000 was paid to and retained by Bosworth.

After the meeting between the Bayuks and the defendants described above and during the preparation of plans, Bosworth held frequent conversations with Bayuk in the course of which Bosworth renewed persuasion that supervision be included in their contract. This resulted in the following understanding (as testified to by Bayuk): "I told Mr. Bosworth at that time that I had no further money and I had access to none, and that I couldn't afford it and if he wanted to supervise it, that was entirely up to him and I would accept it. And at that time also I told him that if in the future I had access to any money, I would pay him what I could afford." To that statement Bosworth had replied: "[Y]ou don't have to give me anything else; I want to supervise this house."

The house was built; Bosworth designed it, Edson approved the design, working drawings and specifications, and Bosworth did provide supervision. In this connection the trial court's findings stated: "Sometime before September 29, 1959, Bosworth and Bayuk made an oral agreement that Bosworth would supervise the construction of the home, in accordance with usual supervision standards, in consideration for the building of the Bosworth designed home by Bayuk, and for the promise to pay additional amounts to Bosworth as funds became available."

Appended to this finding is the court's useful comment: "This agreement is the crux of the problem. Depending upon whether or not Bosworth agreed to supervise, Bayuk or Bosworth has responsibility for the mistakes which were made. As I indicated in my oral decision, I credit Bayuk's testimony on this point. The language in the plans with respect to supervision, the fact of Bosworth's continual presence, the fact of money payments to Bosworth, and the impression which Cummins [the contractor] and other workers on the building had concerning Bosworth's authority all convinced me by a preponderance of the evidence that Bosworth and Bayuk had in fact agreed for supervision by Bosworth."

The court also found: "Edson was not informed by either Bosworth or Bayuk that Bosworth had made the agreement to supervise." But it also found: "During the course of construction, Edson had reason to believe that Bosworth was supervising construction and should have known that Bosworth was supervising construction by representing himself as the agent of Edson."

After stating this the court comments: "Edson was present on at least two occasions during construction and, as an experienced man in the architectural field, he should have appreciated that Bosworth was performing the services required 'of architectural supervision as distinct from design and occasional inspection."

As regards performance of the obligations of design and supervision the trial court found:

"The design and supervision of .construction of the building was properly performed in all respects, except as follows:

"a. Design.

"1. The floor was improperly designed in that concrete tile was to be wedded to plywood in a relatively large area.

"2. A number of the closets were approximately 18 inches in width and should have been at least 24 inches in width.

"3. The outside doors were constructed for a milder climate than Yreka affords, and were of an unusual type which the architect should have known could not satisfactorily be built by craftsmen in the Yreka area.

"b. Supervision of construction.

"1. Plycrate was kept on the floor after it was discovered. As indicated with respect to the cause of action against Cummins, this did not conform to specifications. The architect should have required the removal of the plycrate.

"2. Tile in the kitchen was not properly laid and has an aesthetic disfigurement of serious proportions.

"3. The outside sliding doors were not properly fitted to the building, and, as a result, do not move easily in their tracks.

"4. The fireplace was constructed so that expansion of the lintel or the flue has caused permanent cracking. (*Comment*: The witnesses were unable to describe with accuracy the exact cause of the cracking. There is no doubt the cracking in fact has occurred. Building a fireplace of unusual design requires close supervision. I believe that Bosworth did not exercise the kind of supervision required of a reasonably careful architect under the circumstances.) "

Appellants have not pointed out any respect in which the foregoing findings are not supported by substantial evidence. In fact, no argument whatever is addressed to the court's finding that the *design* was faulty. Argument that Bosworth, at the most, undertook only casual and superficial supervision is sufficiently answered by the trial court's observations stated above.

The contention is made that Bayuk himself interfered with and prevented Bosworth from exercising proper supervision. In this regard appellants lean heavily upon a comment by the court (appended to a finding that Bayuk had exercised reasonable care under the circumstances to insure that the building would be properly constructed). This comment is to the effect that Bayuk and Bosworth did not have a proper "rapport . . . required of an owner and architect attempting to create an unusual building." But the court also went on to conclude that it could not find from the evidence that Bayuk's interference had been to an extent which was unreasonable or beyond that which an architect who had undertaken supervision should have been expected to cope with.

Instances of interference in the record brought to our attention (mostly unrelated to the matters where inadequacy of supervision produced damage) would not justify us, as a reviewing court, in upsetting the finding of the trial court that Bayuk had acted reasonably.

We turn to the contention that Edson cannot be held for Bosworth's faulty supervision since the latter had no ostensible authority to contract for supervision.

An ostensible agency or authority exists when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him or to possess authority he does not actually possess. (Civ. Code, §§ 2300, 2316.) "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof." (Civ. Code, § 2334.) Since Bayuk obviously parted with value, the question we review is whether the facts described above support a judgment founded in part upon Bosworth's ostensible authority (Bayuk himself not being guilty either of bad faith or failing to exercise ordinary care).

In *California Motor Express, Ltd.* v. *Chowchilla Union High School Dist.* (1962) 202 Cal.App.2d 314 [20 Cal. Rptr. 768], the court (per Stone, J.) expresses the principle in the language of the Restatement of the Law of Agency, section 261 (on p. 318): " 'A principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.' " And it is noted that under section 262 of the Restatement the rule stated holds true even though the agent acts solely for his own purposes.

Applying these rules to this case, we hold that substantial evidence supports the trial court's findings. Edson led Bayuk to believe that Bosworth was an architect working for him and was to be the representative of his office with whom Bayuk was to deal.[2] At the original meeting between the Bayuks and defendants, Edson had urged the Bayuks to contract for supervision. Therefore, Bosworth's subsequent

---

[2]For example on one occasion when the Bayuks called at Edson's office in Medford to consult him regarding some problem connected with the plans or construction, Edson referred them to Bosworth who was then at work in a back office.

solicitations would have seemed to the Bayuks merely a continuation of Edson's entreaties. There seems no doubt, as the trial court found, that Edson was aware that Bosworth was affording general, standard architectural supervision. Moreover, the house as designed contained certain novel and untried features which, as the court found, required close supervision.[3] As an architect Edson must have been aware of this. The court therefore could logically have assumed that Edson, being aware of all of these facts, should have realized that Bosworth had contracted with Bayuk for such supervision and that Bayuk would properly assume the supervision bargained for to be a provision tacked onto the original contract.

The court made its award of damages in the sum of $18,500 on evidence which, as the trial judge himself stated, was somewhere short of a type calculated to convince a trier of fact to a moral certainty and beyond all reasonable doubt. ■ The evidence on damages was, nevertheless, substantial: Thomas Riskas, a general building contractor, who had examined the working drawings and who had inspected the house found mistakes in both design and building which he described as ''appalling'' and testified that because of the extent thereof it would be economically unfeasible to repair the defects. To do so, according to his figures, tearing out and repair would cost more than the cost of rebuilding the house in its entirety. The method therefore applied by plaintiffs to compute their damage was by determination of the diminution of market value due to the defects. This was proper under the circumstances. (See rule stated in *Shell* v. *Schmidt*, 164 Cal.App.2d 350, at pp. 359, 360 [330 P.2d 817, 76 A.L.R.2d 792]; and see 5 Am.Jur.2d, Architects, § 24, pp. 687-688, 25 A.L.R.2d 1100-1102 and cases cited.) To make that determination plaintiffs produced as their expert Luke Lange, a realtor and inheritance tax appraiser. Mr. Lange on direct examination fixed the value of the home without the defects at $50,000-$60,000 and the market value with the defects at $27,500 to $31,500, ''somewhere in between.'' (The damages awarded, $18,500, represents the least of the possible remainders.) Appellants object that the expert's testimony on direct examination did not reflect values as of the date of damage and that on cross-examination it appeared that values at the time of trial had been considered. Also

---

[3]This, indeed, was one of the respects in which the trial court found defendants to have been guilty of negligent supervision.

objected to was the fact, brought out on cross-examination, that the expert had given consideration to the reputation which the house had acquired in the community, which reputation had, at least, been contributed to by Bayuk's own publicizing of the defects.

No objection was interposed to any testimony given by the witness on direct examination; no *voir dire* examination was conducted questioning his qualifications or the methods of evaluation he had applied or his figures.

■ As regards the time as of which the appraisals were given damages should, of course, be computed as of the date when they occurred. Here, however, damages are not fixed by values but upon the difference between two values. While values between 1960 and 1963 may have changed, it does not follow that the difference or relationship between the market value of the house properly built and its value in its damaged condition would necessarily change — assuming, of course, that both values are estimated as of the same time. Since here both values *were* figured as of the same time and since no objection was interposed or showing made that a different answer would have been reached to the arithmetical problem of subtraction had 1960 values been used, we deem the defect as going to the weight of the opinion, not its admissibility. The same must be said regarding the fact that Lange on cross-examination admitted that he had taken the reputation of the house in its damaged condition into consideration in estimating its depressed value. The defects which the witness described (all of which were brought out with great particularity on cross-examination) were not only patent to the witness; they must also have been patent to any prospective purchaser to whom the house would be shown. Lange testified: ". . . The floor is screwed up [wavy]: it isn't right. You can tell that by looking at it. The doors in the glass in the front of the house are bound up, they don't open and close freely. . . . The fireplace is badly cracked and it sticks right out. The beams in the roof are twisting and some are lower, some are higher. . . . They're not in line, I will put it that way. There is something wrong with them. . . . The fireplace in the kitchen, . . . [i]ts pulled away from the wall. . . . [Y]ou can't put clothes in the closets, with the exception of the master bedroom, due to the narrowness. . . ." It is impossible for us to believe that reputation could have weighed very heavily when the factors upon which that reputation was based were so readily ap-

parent to any casual observer.     It has been held: "Although . . . where a witness has based his opinion of value entirely upon improper considerations, his opinion as to value should be stricken; where, however, such testimony embraces evidence which is proper as well as that which is not, a motion to strike may properly be denied and the matter left to the jury to determine the weight to be given to the testimony. The question is addressed to the discretion of the trial court. [Citations.]" (*People* ex rel. *Dept. Public Works* v. *Lipari,* 213 Cal.App.2d 485, 493 [28 Cal.Rptr. 808].) That rule is applicable here.

The trial judge, as stated above, did comment upon the fact that neither party had responded to his suggestion to produce evidence of the cost to repair the damage. In his findings, however, he stated: "I do feel, however, that in view of my comments I should accept this testimony [of Luke Lange]. There were some difficulties with respect to the basis of the testimony. I have considered these difficulties and nevertheless accept the figures in question. My view of the premises corroborated the opinion of Mr. Lange. Considering all of the factors involved, I believe this the proper measure of damages on the evidence which was before me." We see no reason to disturb that finding.

Appellants' next contention relates to the bar of the statute of limitations. All parties have accepted subdivision 1 of section 339 of the Code of Civil Procedure as the appropriate statute of limitations. The action was commenced September 28, 1962. The cause of action accrued June 1, 1960. Code of Civil Procedure section 351 provides that, if when a cause of action accrues the defendant is out of the state, the action may be commenced within the statutory time limited after his return, and that if he departs from the state after the accrual of the cause of action "the time of his absence is not part of the time limited. . . ." Edson and Bosworth, both residents of Oregon, were out of the state under this section and not amenable to the service of process (until January 1962 when they stipulated to accept service). Therefore the statute was tolled unless Corporation Code section 15700 applies. That section permits service upon a foreign partnership doing business in California by service upon a designated agent, or if none is designated, upon the Secretary of State.

Obviously, under the facts of this case Edson and Bosworth were not a general partnership. They contend, how-

ever, that theirs was a joint venture and that Corporation Code section 15700 applies to a joint venture. (If defendants were joint adventurers, then, of course, each was the agent for the other, and there could have been no doubt of Bosworth's power to act for the joint venture binding Edson to Bosworth's contract with Bayuk for supervision. Therefore, appellants inconsistently breathe hot and cold, when, inhaling, they contend Bosworth was not Edson's agent and, exhaling, say that he and Edson were joint venturers. As a matter of fact, appellants' own testimony regarding the arrangement between them is so vague it is difficult to be sure just *what* their relationship in this transaction was as between themselves.)

We do not have to decide whether defendants were or were not engaged in a joint venture. Nor do we have to decide whether the Legislature in Corporation Code section 15700, using the term "partnership," intended to embrace a joint venture. Regardless of the relationship as between Edson and Bosworth, where a third party is involved their status depends upon what that third party had a right to believe the relationship to be. (See *Foote* v. *Posey* (1958) 164 Cal. App.2d 210, at p. 216 [330 P.2d 651].) ██ Here as we have seen the evidence accepted by the trial court justified its finding that both Edson and Bosworth had represented their relationship to be that of principal and agent respectively. They are estopped to urge a different relationship for the purpose of donning the comforting cloak of the statute of limitations. (*Carruth* v. *Fritch* (1950) 36 Cal.2d 426, 432-433 [224 P.2d 702, 24 A.L.R.2d 1403].)

Bosworth urges as his last contention that since he was acting for a disclosed principal he, the agent, cannot be held liable. He relies upon the general rule that normally the agent will not be liable in an action based on contract brought by a third person where both the fact of agency and the name of the principal are disclosed. (*Automatic Poultry Feeder Co.* v. *Wedel* (1963) 213 Cal.App.2d 509, 518 [28 Cal.Rptr. 795]; *Hayman* v. *Shoemake* (1962) 203 Cal.App.2d 140, 159 [21 Cal.Rptr. 519].) This rule has applicability when Civil Code section 2343 is not involved. (*Oppenheimer* v. *General Cable Corp.* (1956) 143 Cal.App.2d 293, 297 [300 P.2d 151].)

Civil Code section 2343 provides in part: "One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency, in any of

the following cases, and in no others: . . . 3. When his acts are wrongful in their nature."

██ "[I]f a tortious act has been committed by an agent acting under authority of his principal, the fact that the principal thus becomes liable does not of course exonerate the agent from liability." (*Perkins* v. *Blauth* (1912) 163 Cal. 782, 787 [127 P. 50]; Rest. 2d Agency, §§ 343, 344 et seq; Rest. 2d Agency, Appendix, Rep. Notes, pp. 561, 562; 20 A.L.R. 97; 99 A.L.R. 408.) ██ The fact that the tortious act arises during the performance of a duty created by contract does not negate the agent's liability. (Mechem, Outlines of the Law of Agency (4th ed.) §§ 343, 346, pp. 232, 234.)

██ It is stated in *Eads* v. *Marks*, 39 Cal.2d 807, at pages 810, 811 [249 P.2d 257]: ". . . The same act may be both a tort and a breach of contract. . . . Even where there is a contractual relationship between the parties, a cause of action in tort may sometimes arise out of the negligent manner in which the contractual duty is performed. . . . A tort may grow out of or be coincident with a contract, and the existence of a contractual relationship does not immunize a tort feasor from tort liability for his wrongful acts in breach of the contract. [Citation.]"

*Mears* v. *Crocker First Nat. Bank* (1950) 97 Cal.App.2d 482 [218 P.2d 91], is not in point. It involved nonfeasance; a failure by an agent to perform a duty there held to be owed by the agent only to his principal. We are not here concerned with the worrisome problem of the liability of an agent to third persons for injury resulting from his *failure to perform* a duty which nominally he owes only to his principal. (But see Mechem, *op. cit.*, §§ 347, 348, pp. 235, 236.)

Here the plaintiffs sued for the negligent performance of a contractual duty which Bosworth (although acting under a contract between his principal and plaintiffs) had personally agreed with plaintiffs to perform. He had assumed a duty towards plaintiffs. The court found for plaintiffs on the issue of negligence and found injury proximately resulting therefrom, all on evidence which we hold to be substantial.

The judgment is affirmed.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied August 27, 1965, and appellants' petition for a hearing by the Supreme Court was denied September 29, 1965.