[Civ. No. 1758.   Fourth Appellate District.—April 1, 1937.]

J. L. COATES, Respondent, v. LAKE VIEW OIL AND REFINING COMPANY (a Corporation), Appellant.

114

Lindsay & Gearhart and Bradner & Weil for Appellant.

N. Lindsay South, G. L. Aynesworth and John A. Hewicker for Respondent.

MARKS, J.—Plaintiff recovered damages in the sum of $42,210.16 for the breach of a written contract whereby defendant agreed to furnish plaintiff motor fuel for one year commencing June 15, 1929. This appeal followed.

Defendant presents two grounds for reversal of the judgment: First, that the act of George E. Holmes, an employee of defendant, in signing the written contract which is the foundation of the action, was beyond the scope of his authority and not binding on defendant; and, second, that there is no evidence to support the findings of the amount of the damages awarded plaintiff.

After a study of the record we have reached the conclusion that the second specification of error is well taken and that the judgment must be reversed. We purposely refrain from a discussion of the first specification so that during a second trial the trial judge may be unhampered by anything we might say.

The complaint alleges the execution of a written contract dated July 3, 1929, signed by plaintiff and defendant acting through Holmes. The contract recites that defendant sold and plaintiff bought motor fuel in quantities not less than 720,000 nor more than 1,440,000 gallons to be delivered to plaintiff at defendant's refinery at Pentland, in Kern County, in monthly quantities, totaling not less than 60,000 nor more than 180,000 gallons for the year commencing June 15, 1929. The specifications of the motor fuel are set forth in the contract and the price agreed upon was the basic price of 10¼ cents per gallon, state tax paid, as long as the prevailing tank wagon price of gasoline sold by "the five major oil companies of California" in Fresno remained at 16½ cents per gallon. It provides that this basic price would vary in accordance with certain specified fluctuations in the tank wagon price of gasoline charged by these companies in Fresno. Other provisions of the contract are not material to the discussion of the question of damages.

The complaint has annexed to it a copy of the contract. It alleges that plaintiff performed all his obligations under

the contract and that he demanded full performance by defendant; that defendant delivered only 130,000 gallons of the motor fuel and refused to deliver the balance of 1,310,000 gallons. The only allegation of damage is as follows: ''That the plaintiff has thereby lost profits and has sustained damage to the amount of sixty-five thousand two hundred and eighty-two dollars ($65,282.00).''

The answer puts in issue all material allegations of the complaint, including the due execution of the contract.

The trial court found that the contract had been duly executed; that plaintiff required the maximum of 1,440,000 gallons of motor fuel and that on July 24, 1929, defendant breached the contract; that up to that date defendant had furnished plaintiff with only 172,472 gallons; ''that by reason of defendant's failure, refusal and neglect to perform said agreement on its part, plaintiff was unable to purchase an adequate supply of motor fuel for his business and lost the profits therefrom; that plaintiff tried to purchase motor fuel and gasoline from every available source and was unable to purchase more than a small supply of motor fuel, the same being the only available substitute that he could obtain; that the lowest price at which he could obtain any such motor fuel was at a net loss to him of at least 3.37c per gallon, delivered at Fresno''; that there was an undelivered ''balance of 1,267,528 gallons to which plaintiff was entitled, which defendant wholly failed, refused and neglected to deliver to plaintiff; that the difference between the contract price and the repurchase price of said motor fuel, at the rate of 3.37c per gallon, is the sum of $42,715.69; that from this amount there should be deducted the sum of $505.53, on account of defendant's counterclaim for motor fuel delivered to plaintiff, for which he has not paid, leaving a net loss to plaintiff of $42,210.16, the same being the difference between the amount which plaintiff agreed to pay for said motor fuel and what it would cost him to obtain the only available substitute therefor''.

The rules governing the measure of damages in cases of this kind are thus set forth in *McKay* v. *Riley*, 65 Cal. 623 [4 Pac. 667]:

''Ordinarily, the rule of damages in actions like the present is the difference between the price agreed to be paid and the market value, because the vendee can obtain the article contracted for at the market price. When, however, the circum-

stances are such that the vendee cannot thus supply himself, the rule does not apply, for the reason of it ceases. (*Bank of Montgomery* v. *Reese,* 2 Casey, (26 Pa.) 143.) In such a case the true measure of damages is the actual loss sustained by the vendee, by reason of his not receiving an advance or profit through agreements which he himself has made in reliance upon the fulfilment of his vendor's contract. (*McHose* v. *Fulmer,* 73 Pa. 365, 367.)''

Counsel are not in serious disagreement on the rules governing the measure of damages. They are in disagreement as to the application of these rules to the facts of this case.

▮ It is admitted that where a seller agrees to sell to a buyer an article which has no established market value and the seller breaches his contract to sell and deliver, the buyer may go into the open market and purchase a similar article of merchandise, or if a similar article is not available and purchasable the buyer may purchase a reasonable substitute. If he does so the difference between the contract price and the reasonable market value of the substitute purchased is of value in furnishing a measure of his damage. (55 C. J. 1160, 1174; *Dwight* v. *Callaghan,* 53 Cal. App. 132 [199 Pac. 838]; *LeMoyne Ranch* v. *Agajanian,* 121 Cal. App. 423 [8 Pac. (2d) 1055].) In case the vendee cannot obtain an article similar to the one the vendor agreed to sell him, or a reasonable substitute therefor, and the article has no established market value, his ''loss of profits would be a just element in the admeasurement of damages''. (*Roach Bros. & Co.* v. *Lactein Food Co.,* 57 Cal. App. 379 [207 Pac. 419].)

▮ There is evidence to support the finding that plaintiff could not purchase a motor fuel of specifications comparable to those described in the contract. It is in doubt whether his inability to purchase this motor fuel was due to the fact that none was manufactured, or to the fact that he operated ''cut-rate'' stations and sold to other ''cut-rate'' dealers. There is also evidence to support the finding that plaintiff did purchase a relatively small quantity of gasoline, the only available substitute for the motor fuel. This gasoline, while of low grade, was of much better quality than the motor fuel which was described by one witness as a mixture of distillate and stove oil. It is difficult to determine the exact quantity of the substitute purchased by plaintiff, but we believe we are safe in assuming that it did not exceed 50,000

gallons. The trial court found that the market price of the substitute was 3.37 cents more than the contract price of the motor fuel. This finding is challenged by defendant, but for the purpose of this opinion, we will assume, without holding, that it is supported by the evidence, and also, that the gasoline purchased by plaintiff was in fact a substitute for the motor fuel. This brings this portion of the case within the rule for the measure of damages where an article similar to the one sold cannot be purchased and the vendee purchases the nearest available substitute obtainable for it. It is at once obvious that under this phase of the case, and even with these assumptions in favor of the findings and judgment, that plaintiff would only be entitled to recover 3.37 cents a gallon on the not more than 50,000 gallons of the substitute purchased by him. It is also obvious that this rule for the measure of his damages should not be applied to the undelivered 1,217,528 gallons of motor fuel for which he purchased no substitute.

It is evident that the court was in error in giving judgment for damages of 3.37 cents a gallon on approximately 1,217,528 gallons of motor fuel which defendant did not furnish plaintiff and for which plaintiff purchased no substitute, for the reason, as the trial court found, that no substitute could be purchased in the open market. Assuming that there was no established market value of the motor fuel, the proper measure of damage, on this phase of the case, would have been the loss of profits, if any, suffered by plaintiff by reason of the breach of contract by defendant in its failing to furnish him with approximately 1,217,528 gallons of motor fuel for which no substitute was available and none was purchased.

We have searched the record in an effort to discover any evidence fairly establishing the loss of profits to plaintiff from defendant's breach of the contract, if any, and have found none.

On July 24, 1929, plaintiff was operating five gasoline stations in the city of Fresno and was supplying three others. He testified that after defendant cut off his supply of motor fuel he had to close some of his own stations and lost the patronage of customers because he could not supply a cheap motor fuel which could be resold at a cut-rate price. In answer to the question as to how he estimated his alleged damage of $65,000, he replied: "I demand every gallon covered by

the maximum. I had the same sold and a two cent a gallon bonus if I could guarantee delivery on the same, without a penny overhead.'' He also testified that he netted approximately 2½ cents a gallon on gasoline supplied to his retail customers. He further testified to a profit of from four to five cents a gallon on motor fuel or gasoline sold in his own stations. After weighing all his evidence it would seem that this represented gross and not net profits. We can find no substantial evidence showing, with any degree of certainty, how much of the motor fuel would have been used in his own service stations and how much sold to retail dealers had the motor fuel been delivered by defendant.

In another place in his evidence plaintiff testified that the gross profits from his service stations ''ran all the way from two to five thousand dollars a month''. This included the gross profits on his oil sales, which ran about six hundred dollars each month. There is no way of determining whether he made five thousand dollars gross profits for one month or for more than one month. Neither can we determine for how many months his gross profits were only two thousand dollars, or for how many months they ran between these two figures. At still another place in his testimony he referred to his ''overhead'' as being $700 per month. There is no other evidence of his expense in selling this motor fuel.

█ Gross profits are really not profits at all, for they generally refer to the excess in the selling price over the cost price without deducting the expenses of resale and other costs of doing business. (See *Buie* v. *Kennedy*, 164 N. C. 290 [80 S. E. 445].)

To allow plaintiff to recover a judgment based in part on his gross profits would result in his unjust enrichment. If he is entitled to recover at all, because of his loss of profits, such recovery must be confined to his net profits. Net profits are the gains made from sales ''after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed''. (Black's Law Dictionary, p. 1439.)

We have thus far assumed that the increased cost of 3.37 cents a gallon for about 50,000 gallons of the substitute for the motor fuel purchased by plaintiff has evidentiary support. This estimate made by the trial court might have been inaccurate. The record shows that the trial court, in arriving

at this figure, used the basic contract price of 10¼ cents per gallon as constant during the year, while the contract provided for fluctuations either upward or downward, depending on the "average prevailing tank wagon price of gasoline at Fresno charged by the five major oil companies of California". No evidence of such tank wagon price was introduced. This question should be met at another trial.

Paul J. Hisey, the last witness called for defendant, testified that he had been secretary of the defendant oil company and for several months had been its receiver. If there is a receivership of defendant, counsel should give that matter serious consideration. (See 22 Cal. Jur., p. 523 et seq.)

As the action is to be retried, plaintiff should be permitted to amend his complaint, should he be so advised. In this opinion our principal discussion has been of the evidence and not the pleadings under which it was received.

Judgment reversed.

Barnard, P. J., and Jennings, J., concurred.