**J. R. GRAY COMPANY, Inc., Appellant,**

v.

**Merlin E. JACOBS, Jr., Appellee.**

No. 11023.

Court of Civil Appeals of Texas.

Austin.

Nov. 7, 1962.

Rehearing Denied Nov. 28, 1962.

Hassell & Hassell, Dallas, Arthur P. Bagby, Austin, for appellant.

Cookston & Wise, Dallas, for appellee.

RICHARDS, Justice.

Merlin E. Jacobs, Jr., appellee, brought suit against J. R. Gray Company, Inc., appellant, for the recovery of commissions under the terms of a written contract on the sales of two aircraft owned by appellant and in the alternative, asking that he recover a reasonable fee under the contract for services rendered in making the sales. On the trial before the court without a jury, the Trial Court, having denied recovery of commissions under the contract since there was no "gross profit" from the sales, entered judgment for appellee for $1,338.41 as a reasonable fee for making the sales. At the request of appellant the Trial Court made findings of fact and conclusions of law but refused the additional findings of fact requested by appellant. Appellant has perfected this appeal.

In its first and third points of error appellant complains (1) that the Trial Court erred in construing the contract of employment in holding that the contract was ambiguous as a matter of law and (2) that in admitting extrinsic evidence respecting the alleged ambiguity in the contract, the Trial Court was in error since the terms of the contract were plain and unambiguous.

Appellee asserts in his three cross-points of error that the Trial Court erred in finding that "adjusted gross profit" is the equivalent as "gross profit" since the latter term has a clear and well defined meaning which was agreed to by both parties during the trial; that the finding of the Trial Court that "no gross profit" was made by appellant on the sales in question was not supported by any evidence since by its own records and testimony appellant made a "gross profit" on the sales in question; and that the Court's finding that appellee acquiesced in appellant's practice in treating "gross net profits" as actual "gross profits" is contrary to the law and the evidence since (1) it is uncontradicted that appellee was not in privity with appellant's records nor its method of computing same and (2) such parol proof of a contrary custom or usage would vary the clear and express terms of the contract.

The pertinent parts of the contract or agreement entered into September 27, 1960

between appellant and appellee, effective from July 1, 1960 are as follows:

"1. J. E. Gray Company, Inc. will pay M. E. Jacobs, Jr., a salary of $600.00 per month.

"2. J. E. Gray Company, Inc. will pay a commission on the sale of new and used airplanes sold by M. E. Jacobs, Jr. as follows:

"A. New Aircraft—12% of the gross profit.

"B. Used Aircraft—12% of the gross profit.

"C. Aircraft sold on brokerage— 20% of the net fee received by the company.

"D. In the event of a new or used aircraft owned by the company is offered for sale and there *is no gross profit involved,* a flat fee will be assigned to the airplane and all sales personnel will be informed." (Italics supplied.)

The uncontradicted evidence shows that in accordance with the terms of this contract, appellee sold two airplanes, one a D-50 Twin Bonanza TB to Moran Brothers for a gross sale price of $86,430.00, the total cost of which was $65,121.89, or a difference of $21,298.11. The second sale of a 1961 Bonanza M-35 was made to Russell Firestone, Jr. at a gross sale price of $29,401.00, the cost of which was $25,616.25, or a difference of $3,784.75.

Appellant's sales records show the Firestone transaction as follows:

| "1. | List Price | | $33,905 |
|---|---|---|---|
| 2. | Selling Price | | 29,401.00 |
| 3. | Cost—Invoice | $24,866.25 | |
| | Plus—Internal | 750.00 | |
| 4. | Total Cost | | 25,616.25 |
| 5. | Gross Profit | | 3,784.75 |
| 6. | Trade-in Allowance | 22,787.28 | |
| | Model—K35 Year—1959 | | |
| 7. | Wholesale Value | 17,000.00 | |
| | Difference—over allowance | | 5,787.28 |
| 8. | Adjusted Gross | | (2,002.53)" |

and the Moran Brothers' sale as follows:

| "1. | List Price | | $99,860.00 |
|---|---|---|---|
| 2. | Selling Price | | 86,430.00 |
| 3. | Cost—Invoice | $64,807.50 | |
| | Plus—Internal | 324.39 | |
| 4. | Total Cost | | 65,121.89 |
| 5. | Gross Profit | | 21,298.11 |
| 6. | Trade-in Allowance | 48,430.00 | |
| | Model—B50 Year—1954 | | |
| 7. | Wholesale Value | 25,000.00 | |
| | Difference | | 23,430.00 |
| 8. | Adjusted Gross | | (2,131.89)" |

The Trial Court made the following findings of fact:

"4. On or about December 9, 1960, within the period covered by said contract, plaintiff as salesman for defendant, sold to Moran Brothers a certain D-50-C 1960 model Beechcraft airplane for a stated selling price of $86,430.00, less an agreed trade-in allowance of $48,540.00.

"5. Such sale was approved and confirmed by defendant.

"6. The airplane traded in by Moran Brothers was valued by defendant at $25,000.00, and the fair market value thereof, on a wholesale basis, was $25,000.00.

"7. In accordance with defendant's established practice, the difference of $23,430.00, between the trade-in allowance of $48,430.00 and the wholesale value of $25,000.00 was treated by defendant as an 'over-allowance'.

"8. The stated selling price was not the true selling price, but was only a trading figure, which included the amount of the over-allowance. The actual selling price upon which defendant calculated its 'adjusted gross profit' for its general accounting purposes, as well as for the purpose of determining salesmen's commission, was the stated selling price, less the 'over-allowance'.

"9. Defendant's practice, which had been established before the transaction in question, was to determine its adjusted gross profit on such sales by

calculating the excess, if any, of the actual selling price (the stated selling price less the 'over-allowance') over the inventory cost of the airplane sold.

"10. Before the time of the transaction in question, plaintiff had acquiesced in defendant's practice of treating the 'adjusted gross profit', as above determined, as the 'gross profit' upon which plaintiff's commissions were determined according to the terms of the contract.

"11. No 'gross profit', as that term is used in the contract, was realized by defendant on the sale to Moran Brothers above mentioned.

\*   \*   \*   \*   \*   \*

"17. On or about March 6, 1961, plaintiff, as salesman for defendant, negotiated the lease of a certain Model N–35 Beechcraft airplane to Russell Firestone, Jr., and as part of such transaction defendant agreed to cancel a previous lease for defendant to Firestone of another airplane.

"18. In accordance with defendant's established practice, such lease was treated by both plaintiff and defendant as the same as a sale for purposes of calculating the salesman's commission, and figures were established by the parties to the sale corresponding to the stated selling price, the trade-in allowance, and the value of the airplane traded in.

"19. The stated selling price established for the lease transaction to Firestone was $29,401.00.

"20. The trade-in allowance established by the parties for the airplane traded in (that is, the cancellation of the prior lease) was $22,787.28.

"21. The airplane traded in by Firestone was valued by defendant at $17,000.00, and the fair market value thereof on a wholesale basis, was $17,000.00.

"22. No gross profit was realized by defendant on the lease to Firestone of March 6, 1961."

Appellant's contention is that the term "gross profit" as used in the contract was to be construed as an "adjusted gross profit" and therefore since the "adjusted gross profit" of each of these sales showed a loss, appellee was not entitled to any commission under the terms of the contract. Appellee, on the other hand, contends that the term "gross profit" has a fixed and definite legal meaning and hence he was entitled to be paid a commission of 12% of $21,289.11, the "gross profit" on the Moran sale and of $3,784.75, the "gross profit" on the Firestone sale.

On trial the court asked counsel for both appellant and appellee their position as to whether the term "gross profit" is ambiguous, stating that it did not seem to him that the term was clear in itself without some explanation by extrinsic evidence and construction by the parties. Appellant's attorney stated that "gross profit is ordinarily the difference between the selling price and the cost of the article, exclusive of overhead, rent, electricity, commission, etc." to which the Court replied "Well, that is the sense in which it seems to be used on this card." Appellee's attorney agreed with that definition. But appellant contended that there were actually two gross profits as represented in their record, one being on a cash sale, while on a "trade-in", the "adjusted gross profit" is actually the "gross profit" from an accounting standpoint. Appellee counters that the wording of the contract was plain and unambiguous and did not authorize any adjustment of the "gross profit" as the basis of his commissions.

"Gross profit" is a term having a clear and precise legal meaning. It has been defined as "the excess of the selling price over the cost price without deducting the expenses of resale and other costs of doing business." 38 C.J.S. Gross, p. 1082. The term has also been defined as "the

excess of price received over the price paid for goods before deductions are made for the cost of operation." Hill v. City of Richmond, 181 Va. 744, 26 S.E.2d 48, 54; Coates v. Lakeview Oil & Refining Co., 20 Cal.App.2d 113, 66 P.2d 463, 466.

■ A contract is to be construed under its plain language and where the words used are not susceptible of more than one meaning, there is nothing to be construed. It is only where there is uncertainty as to the meaning of a contract or some portion thereof that rules of construction are to be applied. General American Indemnity Co. v. Pepper, 161 Tex. 263, 339 S.W.2d 660, 661. To construe the term "gross profit" to mean "adjusted gross profit" as appellant contends, with which contention the Trial Court agreed, would be to make an entirely new contract between the parties. The Trial Court "is not at liberty to revise an agreement while professing to construe it," nor does it have the right to make a contract for the parties different from that actually entered into by them. General American Indemnity Co. v. Pepper, supra.

■ We hold that since the term "gross profit" has a clear and precise legal meaning, the wording of the contract is clear and unambiguous and plainly states the rights of the parties. Therefore the Trial Court erred in concluding as a matter of law that since the contract does not expressly provide for a commission in case of the sales involved here, where there is no "gross profit" and no flat fee is assigned, the intention of the parties cannot be definitely determined either from the express language of the contract or by necessary implication and to that extent the contract is ambiguous.

This construction was evidently based upon an erroneous assumption by the Trial Court that there was no "gross profit" in either sale. The Trial Court's findings of fact Nos. 11 and 22, *supra*, that there was no "group profit" arising from either sale

was based upon the testimony by appellant's witnesses as to the "established practice" used by appellant in ascertaining the "gross profit" of a sale where a "trade-in" was involved by a different accounting method from that used in computing the "gross profit" in a sale for cash.

■ Where a contract plainly states the rights of the parties, proof of general custom or practice is not necessary or proper in its construction, the intention of the parties being derived from the language used where its meaning is clear and unambiguous. Government Personnel Mutual Life Ins. Co. v. Wear, Tex.Civ.App., 247 S.W.2d 284, 288, aff. and mod. on other grounds, 151 Tex. 454. 251 S.W.2d 525. "Parol evidence is not admissible to show that parties to a contract used language in a sense different from its ordinary meaning, for that would effectively vary the terms of the contract." Morrison v. Hazzard, 99 Tex. 583, 92 S.W. 33, 35. The Trial Court erred in admitting evidence for the purpose of showing appellant's general custom or practice in computing its "gross profit" for accounting purposes as an "adjusted gross profit" where "trade-ins" are involved.

■ In addition, the Trial Court's finding of fact No. 10 that before the Moran Brothers' sale was made, appellee had acquiesced in appellant's practice in treating the "adjusted gross profit" as the "gross profit" upon which his commissions were determined under the contract is without any support in the evidence. Appellant's sales record cards on the two transactions *supra* kept by appellant's officer were for all practical purposes not available to appellee. Appellant's witness George J. Hubbard, who was vice president and sales manager of appellant at the time of the transactions, testified that the sales record cards in question, which were the only set of cards kept at the Company, were kept in his file box in his desk drawer; that while the drawer was unlocked part of the time, it was not a customary prac-

tice for him to allow any of the employees or salesmen to go through his desk at any time they desired and that to his knowledge he never saw anyone do that. The witness also stated that the entry of the "gross profit" was made subsequent to each sale.

It seems clear that since appellee was not apprised by appellant's officers or personnel as to the method used in computing the "gross profit" or the "adjusted gross profit" at the time the sales were made and he did not have access to or see the records showing such computations, he could not be considered to have acquiesced in the Company's practice or custom of accounting.

■ The Trial Court having erred in finding that there was no "gross profit" resulting from the sales to Moran Brothers and Firestone, which under the uncontradicted testimony were procured and made by appellee, appellee is entitled to recover the commissions due him under the written contract for each of these sales amounting to 12% of $21,298.11, the "gross profit" on the Moran Brothers sale and 12% of $3,784.75, the "gross profit" on the Russell Firestone, Jr. sale. Appellant's 1st and 3rd points of error and appellee's 1st, 2nd and 3rd cross-points of error are sustained.

Appellant's 2nd point of error is that the Trial Court erred in its construction of the contract in holding that the sales in controversy were not within the express terms of such contract and since there was no "gross profit" in the sales that appellee was entitled to seek compensation in excess of his salary provided in the contract.

Appellant's 4th, 5th, 6th and 7th points of error, contend that the Trial Court erred in concluding as a matter of law that in the absence of any contractual provision which expressly or impliedly excludes payment of a commission on the sales, appellee was entitled to a commission for his services in making such sales and that in the absence of any agreement fixing the amount of such commissions, appellee was entitled to a reasonable commission on each sale because plaintiff was paid a salary and the contract on its face was not subject to the construction that further compensation was payable, and in addition, there was no evidence as to what a reasonable commission for making the sales would be.

■ It should be noted that paragraph "D" provides that in the event of a new or used aircraft owned by appellant is offered for sale and *"there is no gross profit involved"* a flat fee will be assigned to the airplane. Appellant admitted that in neither of the transactions was any flat fee assigned to appellee. In fact at the time appellee severed his connection with appellant, it was not known to either party whether there would be any "gross profit" resulting from the Firestone sale. The Trial Court, in entering judgment in favor of appellee in the sum of $1338.41 under his alternative cause of action in quantum meruit, did so under the theory that since there was no "gross profit" involved in either of the sales and no flat fee had been assigned in accordance with paragraph "D", appellee was entitled to recover in quantum meruit a reasonable fee for services rendered.

Since we have already held that there was a "gross profit" resulting from each of the sales, paragraph "D" of the contract has no application and therefore there can be no basis for recovery for appellee's cause of action in quantum meruit. It thus becomes unnecessary for us to discuss or rule upon appellant's points of error 2, 4, 5, 6 and 7.

■ Appellee's 4th cross-point of error urges that the Trial Court's finding of no "gross profit" on the Firestone sale was contrary to all of the evidence because of the statement in appellant's records that it made $3,784.75 "gross profit" on the sale of the new aircraft, plus an admitted additional profit of $3,000.00 from the sale of the "trade-in" or a total amount of $6,-

784.75. In view of our holding that appellee is entitled to recover his 12% commission on the "gross profit" of $3,784.75 on the Firestone original sale under the terms of the contract, he is not entitled to recover a commission on the additional $3,000.00 profit resulting from the sale of the aircraft received as a "trade-in" on the original sale since each sale constitutes an entirely different transaction. Appellee admitted he rendered no services in the sale of the aircraft received as a "trade-in" on the original sale. Appellant's 4th cross-point of error is overruled.

The judgment of the Trial Court is reversed and judgment rendered that appellee Merlin E. Jacobs, Jr. recover from appellant J. R. Gray Company, Inc., the sum of $3,009.93, being 12% of the sum of $25,082.86, the gross profits resulting from the sales made by Jacobs of appellant's aircraft to Moran Brothers and Russell Firestone, Jr. under the terms of the written contract dated September 27, 1960. All costs of court are taxed against appellant.

Reversed and rendered.