[Civ. No. 9463. Fourth Dist., Div. Two. Jan. 8, 1971.]

HENRY J. GERWIN, Plaintiff and Respondent, v.
SOUTHEASTERN CALIFORNIA ASSOCIATION OF
SEVENTH DAY ADVENTISTS, Defendant and Appellant.

212

**COUNSEL**

James L. King, Musick, Peeler & Garrett and Bruce E. Clark for Defendant and Appellant.

Hennigan, Butterwick, Haning & Duda and J. David Hennigan for Plaintiff and Respondent.

**OPINION**

**TAMURA, J.**—Plaintiff brought an action seeking specific performance and damages for breach of an alleged contract for the sale from defendant to plaintiff of certain restaurant and bar equipment. Following a nonjury trial the court found in favor of plaintiff and entered judgment which, (1) decreed specific performance, or, in the event defendant fails or is unable to deliver the property, ordered payment of damages in the sum of $15,000 in lieu of specific performance, and (2) awarded plaintiff consequential damages for loss of anticipated profits in the sum of $20,000. Defendant appeals from the judgment.

Defendant, in essence, poses three basic issues: (1) sufficiency of the evidence to support the findings justifying the conclusion that a contract was entered into, (2) sufficiency of the evidence to support the award of damages in lieu of specific performance, and (3) validity of the award of consequential damages.

Where an attack is made on the sufficiency of the evidence to sup-

port findings, it is axiomatic that a reviewing court must view the evidence in a manner most favorable to the party prevailing below. (*Waller* v. *Southern Pacific Co.,* 66 Cal.2d 201, 204 [57 Cal.Rptr. 353, 424 P.2d 937]; *Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183].) So viewing the evidence, the salient facts may be summarized as follows:

In October 1964 defendant entered into an agreement and escrow with the Grand Terrace Country Club (Grand Terrace) for the purchase of the Azure Hills Country Club (Club) including its buildings, furniture, fixtures and equipment. The escrow was to close December 21, 1964. Under the terms of the agreement Grand Terrace agreed to secure a purchaser for the bar fixtures and equipment, tables and chairs in the cocktail lounge, and a liquor license, the net proceeds of such sale to be deposited in escrow and credited to defendant towards the purchase price. It was agreed that the sale of the items would be handled through Mr. Harty who was president of Grand Terrace as well as a real estate broker. Thereafter Harty let it be generally known that the bar equipment and furniture and furnishings of the cocktail lounge were for sale.

Plaintiff had recently acquired a hotel in Beaumont and needed equipment for a proposed bar and restaurant which he planned to operate in conjunction with the hotel. In late November 1964 he learned of the availability of the equipment of the Azure Hills Country Club. He called defendant's office and was informed that the sale was being handled through Harty. Plaintiff went to the Club and spoke to Harty. Harty took plaintiff on a tour of the Club bar and cocktail lounge and showed him generally the items to be sold. Plaintiff made several other visits to the Club to view the equipment. On one of these visits he obtained from someone a purported inventory of items to be sold and, in addition, made note of the serial numbers of several cash registers he saw in the bar.

On December 18, 1964, plaintiff had Mr. Katz of the All State Furniture Co. submit a bid on his behalf for $3,000. On the same day, plaintiff received a call from Harty inquiring whether he was still interested in the equipment. From that conversation plaintiff gained the impression he would have to bid more than $3,000 to be successful. He went to the Club and spoke to Harty. Following the conversation, plaintiff prepared a handwritten bid for $3,501, signed it "Bud Turner for Henry J. Gerwin," and handed it to Harty. Bud Turner was the manager of plaintiff's hotel.

Upon his return home that day (December 18) plaintiff's wife told him someone called indicating that plaintiff would have to bid $4,000 or more for the property. Plaintiff thereupon contacted a Mr. Cunningham for the

purpose of having him submit a bid on plaintiff's behalf. Either plaintiff or Cunningham called defendant's office to determine whether it was too late in the day to submit a bid. They were informed that it was but that bids would still be received through the following Monday, December 21, 1964. Thereafter, under plaintiff's direction, Cunningham typed out a bid for $4,126 for certain described items, including cash registers. The bid was made out in the name of "Richard Cunningham and Associates," dated December 21, 1964, and was signed by Cunningham. On the afternoon of December 21 Cunningham took the bid to the Club and asked a secretary in one of the offices for Harty, stating he wished to leave a bid with him. The secretary stated Harty was out but that she would deliver the bid to him when he came in the following day. Cunningham left the bid with the secretary.

On December 21 or 22, 1964, the escrow was closed and defendant took possession of the premises. By December 22, 1964, Harty had received several bids. On December 22 he placed the bids, together with his tabulation showing the bids received, in a folder, and delivered the folder to one of defendant's officers. Defendant's minister, Mr. Gray, at one time had possession of the folder but it disappeared some time before trial. It could not be found and was not produced at trial.

In early January 1965 Mrs. Cunningham received a telephone call informing her that her husband's bid had been accepted and that a $1,000 deposit would be required. Mrs. Cunningham went to the Club, talked to Mr. Shepard, defendant's treasurer, and requested that the deposit be reduced to $500. After placing a telephone call to someone, Mr. Shepard agreed to accept a $500 deposit. Mrs. Cunningham then requested and received from Shepard a signed confirmation of the acceptance of Cunningham's bid; the statement read in part: "This is to confirm that Richard W. Cunningham's bid of $4,126 is accepted on complete bar equipment for Azure Hills Country Club." Shepard told Mrs. Cunningham that the equipment could not be picked up for 30 to 45 days because of a pending bankruptcy proceeding affecting the property. The Cunninghams made the $500 deposit by two checks.

In late January 1965, Cunningham received from defendant a proposed written option to buy specified items listed therein within 90 days for the sum of $4,126 with credit for the $500 deposit. Cunningham discussed the option with plaintiff. Plaintiff requested Cunningham to have the proposed option amended to include plaintiff as one of the optionees. Cunningham conveyed this request to defendant who prepared and submitted to Cunningham a second proposed option agreement naming both Cunningham and

plaintiff as optionees. In examining the proposed option, plaintiff noted that the items listed failed to include some items described in Cunningham's bid, particularly certain cash registers. Plaintiff called Mr. Groome, defendant's assistant secretary-treasurer, and pointed out the discrepancy. Mr. Groome told plaintiff not to be concerned because the differences could be resolved later. Neither Cunningham nor plaintiff signed the proposed option agreements.

On June 30, 1965, Cunningham received a letter from Mr. Groome informing him that title to the bar equipment had been cleared and that defendant was in a "position to deliver to you as per the terms of your option to purchase." The letter requested $3,625 as payment in full. On July 9, 1965, plaintiff paid the $3,625 and was given a receipt signed by Mr. Wisbey, one of defendant's ministers; the receipt stated that payment was "for merchandise sold to Dick Cunningham and Henry J. Gerwin as per submitted bid dated December 21, 1964."

On July 12, 1965, plaintiff and Cunningham went to the Club to pick up the equipment. A dispute arose as to the items to be delivered. The parties were unable to settle their differences and as a consequence defendant refused to deliver any of the items.

In addition to the foregoing facts, plaintiff introduced evidence of alleged damages sustained by him. That evidence will be reviewed in subsequent portions of this opinion relating to the damage issues.

The court found that Cunningham's written bid was received and accepted by defendant; that the bid was definite and certain respecting the items bid upon; that it was agreed that delivery be delayed to July 12, 1965; that defendant refused to deliver; that plaintiff performed all of the required conditions; that the contract was fair and equitable; that the reasonable value of the equipment as of July 12, 1965, was $25,000; and that plaintiff, in addition, suffered consequential damages of $20,000. The judgment decreed specific performance. or, in lieu thereof, ordered payment of $25,000, and, in addition, awarded consequential damages of $20,000. Defendant moved for a new trial. The court denied the motion but amended the judgment by reducing the award in lieu of specific performance from $25,000 to $15,000.[1]

---

[1]Presumably the court modified the judgment pursuant to section 662 of the Code of Civil Procedure. (*Spier* v. *Lang*, 4 Cal.2d 711, 714 [53 P.2d 138]; 3 Witkin, Cal. Procedure (1954) p. 2083.) It is noted, however, that the court's previous finding that the value of the goods was $25,000 was not amended to conform to the amended judgment. Since neither party raises this question, we will treat the finding as though it had been amended to conform to the amended judgment.

## I

■ Defendant's main contention is that the evidence is insufficient to support the findings justifying the conclusion that a contract was entered into. The thrust of defendant's contention is that the evidence failed to show the parties ever agreed upon the items to be sold in that Cunningham's bid was merely a general telephonic bid and that his purported written bid was never received or accepted by defendant.

Defendant cites Harty's testimony that the only bid submitted by Cunningham was by telephone on December 18 and argues that the tabulation of bids prepared by Harty confirmed that fact because Harty had written a telephone number opposite Cunningham's name. Defendant also cites testimony from its officers and agents that they had never seen a written bid from Cunningham. Defendant further urges that in view of a pending bankruptcy proceeding affecting the property and the fact that certain cash registers listed in Cunningham's bid had been repossessed by the conditional seller in late December 1964 or early January 1965, it would have been extremely unlikely that defendant received or accepted Cunningham's written bid.

However, there was substantial evidence to support the trial court's finding that Cunningham's written bid was received and accepted by defendant. Harty testified he told plaintiff that all bids had to be submitted in writing. Cunningham testified he left the written bid for Harty at the Club on December 21 with assurance from the secretary that it would be delivered to Harty the following day. Defendant's July 9, 1965, receipt for the payment of the balance recited it was for merchandise as "per bid dated December 21, 1964." The fact that a telephone number appeared opposite Cunningham's name in Harty's tabulation of bids did not necessarily confirm Harty's testimony that Cunningham's bid was by telephone. A telephone number appears on the tabulation opposite the name of Bud Turner even though the evidence was uncontradicted that plaintiff submitted that bid in writing and in person to Harty. Moreover, the tabulation shows that the only bidder opposite whose name Harty had written the word "telephone" was that submitted by All State Furniture Co. (Mr. Katz).

We conclude there was substantial evidence supporting the finding that Cunningham's written bid was received and accepted by defendant. Although the evidence was conflicting, it is not our function to reweigh the evidence or judge the credibility of the witnesses.

Defendant argues that the proposed option agreements constituted a counteroffer. Though not articulated with clarity, defendant appears to be arguing that the fact that defendant prepared and submitted the proposed

option agreements indicated that defendant had not previously accepted Cunningham's written bid. Suffice it to say, there was substantial evidence that Cunningham's bid had been received and accepted before the proposed option agreements were submitted. Defendant suggests that plaintiff is somehow precluded from claiming all of the items listed on Cunningham's bid on some vague theory of estoppel, acquiescence, or waiver, because plaintiff failed to complain of the discrepancy between the items listed in Cunningham's written bid. Apart from the fact that the evidence shows that plaintiff did complain of the discrepancy, it would be a strange legal paradox if plaintiff's failure to execute the proposed option agreement could somehow be transformed into an agreement to be bound by its terms.

Defendant also urges that Cunningham's bid description of certain items was uncertain. However, other than that bare assertion defendant fails to show why the items described could not be identified from the description given. The evidence shows that they were identifiable.

We conclude that there was substantial evidence supporting the court's findings and conclusion that a contract was created.

## II

We next consider the damage issues. As heretofore noted the court awarded $15,000 direct or general damages as an alternative to specific performance and, in addition, $20,000 consequential damages for loss of anticipated profits. Defendant contends that the $15,000 award was excessive and that the award of consequential damages based upon loss of anticipated profits was improper.

The rights of the parties in the instant action must be determined in accordance with the applicable provisions of the Uniform Commercial Code. (Com. Code, § 2102.) The code became operative on January 1, 1965. (Com. Code, § 10101.) The contract in question was entered into some time in early January 1965.

Under the former Uniform Sales Act where the seller refused to deliver goods, the buyer's remedy was to sue for breach of contract and to recover the loss directly and naturally resulting or, where there is an available market and in the absence of some special circumstance, the difference between the market price and the contract price. (Former Civ. Code, § 1787.) The Commercial Code introduced a new concept known as "cover."[2] Where the seller refuses to deliver, the buyer may "cover" by

[2]For a study on a comparison of the buyer's remedy under the Sales Act and under the Commercial Code, see Comment, 11 U.C.L.A. L.Rev. 78, 121-132.

making, in good faith and without unreasonable delay, a reasonable purchase of goods in substitution for those due from the seller and recover from the seller as damages the difference between the cost of "cover" and the contract price, together with any incidental or consequential damages. (Com. Code, § 2712.) If the buyer elects not to "cover," he may sue for breach in which event the measure of damages is the difference between market price and the contract price (Com. Code, § 2713) and any consequential damages "which could not reasonably be prevented by cover or otherwise . . . ." (Com. Code, § 2715).

Although plaintiff failed to "cover," failure to do so did not bar him from the right to recover damages for the difference between market price and the contract price under section 2713 of the Commercial Code. (Com. Code, § 2712.)

There was substantial evidence to support the amount of the alternative award of $15,000. Plaintiff testified he had owned and operated bars, was familiar with the cost of bar equipment and cash registers, and that his investigation disclosed that the cost of obtaining "similar type of equipment" ranged from $25,000 to $75,000. His testimony was uncontradicted. ■ Evidence of cost, uncontradicted by other evidence, is sufficient to support a finding of value. (*Sanders* v. *Austin,* 180 Cal. 664, 666 [182 P. 449]; *Lauder* v. *Jobe,* 261 Cal.App.2d 539, 543, 544 [68 Cal.Rptr. 63]; *Wood* v. *Moore,* 64 Cal.App.2d 144, 150 [148 P.2d 91]; *Bacigalupi* v. *Phoenix Bldg. etc. Co.,* 14 Cal.App. 632, 637 [112 P. 892].) ■ There was also testimony from a Mr. Harris, a restaurant owner in Palm Springs, from whom testimony was elicited on cross-examination respecting the cost of new bar equipment and its market value as used equipment. In addition, numerous photographs were received in evidence depicting the type and quality of the furniture and furnishings of the Azure Hills Country Club bar and cocktail lounge. Defendant offered no evidence on the damage issues, nor did it challenge the qualification of plaintiff to express an opinion on value. ■ The qualification of a witness to testify as to value of property rests largely in the sound discretion of the trial court (*Goodman* v. *Community S. & L. Assn.,* 246 Cal.App.2d 13, 23 [54 Cal.Rptr. 456]), and the degree of a witness' knowledge ordinarily goes to the weight rather than the admissibility of his testimony. (*Pfingsten* v. *Westenhaver,* 39 Cal.2d 12, 20 [244 P.2d 395].) ■ The award of $15,000 as direct damages in lieu of specific performance was supported by substantial evidence.[3]

---

[3]Both under the former law (*S.L. Jones & Co.* v. *Bond,* 191 Cal. 551, 556 [217 P. 725]) and under section 2713 of the Commercial Code, the measure of damages for a seller's refusal to deliver is the difference between the market price and the contract

■ We turn next to the award of $20,000 for consequential damages for loss of anticipated profits.

As noted earlier herein, if a buyer elects not to "cover" and sues for damages for breach, the measure of damages is the difference between market value and the contract price (Com. Code, § 2713), and any consequential damage "resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . . ." (Com. Code, § 2715.) Paragraph 2 of the Uniform Commercial Code comment to section 2715 states: "Although the older rule at common law which made the seller liable for all consequential damages of which he had 'reason to know' in advance is followed, the liberality of that rule is modified by refusing to permit recovery unless the buyer could not reasonably have prevented the loss by cover or otherwise. . . ." Thus, in order to recover consequential damages other than those which could not have been avoided by cover or otherwise, the buyer must have made a good faith attempt to mitigate his losses by "cover." The concept of "cover" thus serves two purposes; it enables the buyer to make reasonable substitute purchases and to recover the cost thereof rather than the difference between market value and contract price and, at the same time, protects the seller from consequential damages which could have been mitigated by the purchase of substitute goods. (See Farnsworth, *Legal Remedies for Breach of Contract,* 70 Colum.L.Rev. 1145, 1183-1199; Comment, 11 U.C.L.A. L.Rev. 78, 123-124.)

In the present case plaintiff did not cover. But it does not follow that he was thereby precluded from recovering consequential damages. Plaintiff was unable to purchase substitute items because of their unavailability at prices within his financial ability. ■ Ordinarily a duty to mitigate does not require an injured party to take measures which are unreasonable or impractical or which require expenditures disproportionate to the loss sought to be avoided or which are beyond his financial means. (*Jordan* v. *Talbot,* 55 Cal.2d 597, 611 [12 Cal.Rptr. 488, 361 P.2d 20, 6 A.L.R.3d 161]; *Valencia* v. *Shell Oil Co.,* 23 Cal.2d 840, 846 [147 P.2d 558]; *Schultz*

---

price. In the present case the findings do not reveal whether in arriving at the sum fixed for the reduced alternative award the court deducted the contract price from the market price or whether such deduction was not made because plaintiff had already paid the contract price. It would appear that plaintiff paid the entire purchase price since the court found defendant mailed a cashier's check in the amount of $4,125 in an attempt to rescind and that plaintiff mailed the check back. This may explain why the deduction was not made. In any event, since neither party raises this issue, we assume that the $15,000 represents the net direct damage suffered by plaintiff.

v. *Town of Lakeport,* 5 Cal.2d 377, 384 [54 P.2d 1110, 55 P.2d 485, 108 A.L.R. 1168]; *Green* v. *Smith,* 261 Cal.App.2d 392, 396 [67 Cal. Rptr. 796]; see 5 Corbin, Contracts (1964) § 1042, p. 268.) That principle should govern in determining whether a buyer acted reasonably in failing to cover or otherwise mitigate his losses. (See 5 Corbin, Contracts (1964), *supra,* § 1039, pp. 245-246.) In the circumstances here presented plaintiff's failure to purchase substitute goods did not, in and of itself, preclude his recovery of consequential damages. By ordering specific performance, the court impliedly found that after reasonable effort plaintiff was either unable to effect cover or the circumstances reasonably indicated that such effort would be unrewarding. (Com. Code, § 2716, subd. (3).) There was substantial evidence to support such an implied finding.

Nevertheless the evidence in the instant case is insufficient to support the award of damages for loss of prospective profits. The Commercial Code permits recovery of consequential damages for "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know. . . ." (§ 2715.) Paragraph 3 of Uniform Commercial Code comment to section 2715 states in part: "Particular needs of the buyer must generally be made known to the seller while general needs must rarely be made known to charge the seller with knowledge." In substance, the section codifies the rule enunciated in *Hadley* v. *Baxendale,* 9 Exch. 341 [156 Eng. Reprint 145]; the test is one of reasonable foreseeability of probable consequences. (See *Automatic Poultry Feeder Co.* v. *Wedel,* 213 Cal.App.2d 509, 513-514 [28 Cal.Rptr. 795]; *Sabraw* v. *Kaplan,* 211 Cal.App.2d 224, 227 [27 Cal.Rptr. 81].) Foreseeability, however, is to be determined as of the time the contract was entered into and not as of the time of the breach or some other subsequent event. (Farnsworth, *Legal Remedies for Breach of Contract, supra,* 70 Colum.L.Rev. 1145, 1203; 5 Corbin, Contracts (1964), *supra,* § 1008, pp. 73-76.)

In the present case the court found that defendant knew "that plaintiff intended to use the assets to run a restaurant, hotel and cocktail lounge." However, there was no evidence to show that defendant accepted Cunningham's bid with knowledge that plaintiff was interested in it. There was nothing in Cunningham's bid showing plaintiff's interest in it or that Harty or any of defendant's representatives knew that Cunningham was submitting the bid on behalf of plaintiff. The bid was signed only by Cunningham; Cunningham personally submitted it; Cunningham made the required deposits with his checks; the confirmation of acceptance of the bid and receipt for the deposit referred to the bid by Cunningham; and all communications from defendant concerning that bid were with Cunningham. It was only after Cunningham requested that the proposed option agreement

submitted to him be revised to show plaintiff as one of the optionees that defendant was made aware of plaintiff's interest in that bid. The record discloses that plaintiff attempted to conceal his identity as a bidder by submitting through Turner and Cunningham to avoid payment of a commission to Mr. Katz of All State Furniture. He testified that he agreed to pay Katz a commission for submitting a bid and was afraid the commission would have been payable on any successful bid submitted by plaintiff. At the time it accepted the bid, defendant could not reasonably have foreseen the probable consequences of its breach upon plaintiff when it didn't even know it was contracting with him. Although plaintiff made known to defendant his particular need for the equipment when he went to pick up the items on July 12, 1965, knowledge on the part of the seller at the time of breach is insufficient.

Apart from the foregoing, the evidence discloses deficiency in proof of anticipated profits.

It has been frequently stated that if a business is new, it is improper to award damage for loss of profits because absence of income and expense experience renders anticipated profits too speculative to meet the legal standard of reasonable certainty necessary to support an award of such damage. (*MacMorris Sales Corp.* v. *Kozak,* 263 Cal.App.2d 430, 442 [69 Cal.Rptr. 719]; *Handley* v. *Guasco,* 165 Cal.App.2d 703, 712 [332 P.2d 354]; *Lacy Mfg. Co.* v. *Gold Crown Mining Co.,* 52 Cal.App.2d 568, 574 [126 P.2d 644]; *Evergreen Amusement Corp.* v. *Milstead,* 206 Md. 610 [112 A.2d 901, 904-905]; see Note, *The Requirement of Certainty in the Proof of Lost Profits,* 64 Harv.L.Rev. 317, 319.) However, the rule is not a hard and fast one and loss of prospective profits may nevertheless be recovered if the evidence shows with reasonable certainty *both* their *occurrence* and the *extent* thereof. (See *Mahoney* v. *Founders' Ins. Co.,* 190 Cal.App.2d 430, 436 [12 Cal.Rptr. 114]; see *Grupe* v. *Glick,* 26 Cal.2d 680, 693-694 [160 P.2d 832]; *Edwards* v. *Container Kraft Carton etc. Co.,* 161 Cal.App.2d 752, 759 [327 P.2d 622]; 5 Corbin, Contracts (1964), *supra,* § 1023, pp. 150-151; Rest., Contracts, § 331.) In the present case the question is whether the evidence of loss of prospective profits meets that standard.

The evidence on loss of anticipated profits in the present case may be summarized as follows:

Plaintiff acquired a hotel in Beaumont in June 1964. It was a two-story structure; the second floor consisted of some 25 guest rooms and the first floor a few additional guest rooms, a kitchen, banquet hall, space for a

cocktail lounge and coffee shop. The hotel was vacant when plaintiff acquired it and had not been in operation for some time. There were no furnishings or furniture in it other than that provided for guest rooms. Plaintiff commenced renting some rooms in the fall of 1964.

In December 1964, Mr. and Mrs. Turner, whom plaintiff had employed to manage the hotel, signed a proposed three-year lease covering the entire hotel at a rental of $1,500 per month. Under the proposal, plaintiff was required to furnish and equip the kitchen, coffee shop and cocktail lounge. Plaintiff did not sign the lease because he was unable to obtain the necessary furnishings and equipment.

Plaintiff testified he had never before operated a hotel but that he had owned and operated bars in Los Angeles and that in his opinion the Turners would have been able to pay the $1,500 per month rental. Plaintiff also testified that he had an offer to lease only the banquet room and restaurant space for a monthly rental of $450 provided he furnished and equipped them.

The foregoing evidence fails to measure up to that degree of reasonable certainty required to support the award for loss of anticipated profits. The business being new, plaintiff was obviously unable to produce evidence of operating history of the proposed venture. But neither did he introduce even evidence of operating history of comparable businesses in the locality. Although plaintiff expressed his opinion that Turners could have paid the $1,500 per month rental for the operation of the hotel, bar and restaurant, plaintiff had no prior experience in the operation of a hotel or of a bar in the locality in question. In these circumstances it was speculative and conjectural whether the venture would have generated the business necessary to enable the Turners to pay the $1,500 per month.

Moreover, there was no showing that the rental income from the lease would have constituted net profit to plaintiff. Under the terms of the proposed lease plaintiff was required to provide and install the necessary equipment, furniture and furnishings. Amortization of such costs as well as interest on his capital investment, taxes, and cost of maintenance should have been deducted. When loss of anticipated profits is an element of damages, it means net and not gross profits. (*Olcese* v. *Davis*, 124 Cal.App.2d 58, 62-63 [368 P.2d 175]; *West C. Winery* v. *Golden W. Wineries*, 69 Cal. App.2d 166, 169 [158 P.2d 623]; *Coates* v. *Lake View Oil & Refining Co.*, 20 Cal.App.2d 113, 119 [66 P.2d 463]; Rest., Contracts, § 331, com. b.) ■ As the court noted in *Coates, supra,* at p. 119: "To allow plaintiff to recover a judgment based in part on his gross profits would

result in his unjust enrichment. If he is entitled to recover at all, because of his loss of profits, such recovery must be confined to his net profits. Net profits are the gains made from sales 'after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed'. (Black's Law Dictionary, p. 1439.)" ■ In the instant case the evidence, at the very most, showed loss of gross revenue, not loss of net pecuniary gain. An award of consequential damages based on loss of anticipated profits, particularly in a new venture, may not be sustained on such evidence.

### III

■ Defendant urges that the court erred in decreeing specific performance insofar as two cash registers were concerned because they had been returned to the conditional seller long before the present action was instituted. Since the judgment afforded defendant the alternative of paying damages, the error, if any, was nonprejudicial.

For the foregoing reasons that portion of the amended judgment awarding plaintiff $20,000 as consequential damages (paragraph II of judgment) is reversed; the remainder of the judgment is affirmed.

Gardner, P. J., and Kerrigan, J., concurred.