[Civ. No. 45533. Second Dist., Div. Five. July 16, 1975.]

CAMROSA COUNTY WATER DISTRICT,
Plaintiff and Respondent, v.
SOUTHWEST WELDING AND MANUFACTURING
COMPANY et al., Defendants and Appellants.

952

■■■■■■■■■■■■■■■■

## COUNSEL

Krag & Krag and Donald R. Krag for Defendants and Appellants.

Hathaway, Clabaugh, Perrett & Webster and John R. Webster for Plaintiff and Respondent.

## OPINION

**LORING, J.**\*—On September 13, 1972, Camrosa County Water District (Camrosa) filed an action against Southwest Welding and Manufacturing Company, a corporation (Southwest) and General Insurance Company of America, a corporation (General)[1] for damages "in excess of $5,000 according to proof" for breach of warranty of the quality of five water tanks. Southwest and General answered on October 20, 1972, and denied liability. At nonjury trial Southwest and General admitted liability. The

---

\*Assigned by Chairman of the Judicial Council.

[1]Other named defendants apparently did not appear in the action and are not parties to this appeal.

court filed notice of intended decision to render judgment in favor of Camrosa for $22,728 and directed counsel for plaintiff to prepare findings and judgment. Southwest and General objected to any finding of damage in excess of $17,628. The objection was overruled and findings were made and judgment entered fixing damages in the amount of $22,728. Southwest and General appeal from the judgment.

CONTENTIONS

Appellants contend:

I The finding that the reasonable cost of repairs was $22,728 is not supported by the evidence.

II Evidence of damage is relevant only if it bears on the detriment proximately resulting from the breach of contract.

III Camrosa's damage as established by the evidence amounts to only $17,628.

FACTS

Camrosa and Southwest entered into a written contract under which Southwest agreed to construct five water tanks at a total lump sum price of $295,017 with a three-year warranty of quality. General provided a three-year warranty bond. The three-year warranty expired on March 31, 1972. On January 24, 1972, Camrosa inspected the tanks and found what it believed to be defective areas in the vinyl lining coatings of the interior of the reservoir surface. On January 31, 1972, Camrosa sent Southwest a letter advising it of the defects and requested that the necessary repairs be made (plaintiff's exhibit 6). On April 20, 1972, the attorneys for Southwest sent Camrosa a letter advising that Southwest would not undertake to correct the interior vinyl lining work (plaintiff's exhibit 9). In April 1972, Camrosa requested and received bids from three companies to do the repair work for $19,525, $27,982 and $30,048. The low bid of $19,525 was submitted by Calblasco.

At trial (Dec. 17-20, 1973) Camrosa offered evidence from Calblasco over defendants' objection that the cost of doing the repair work at time of trial would be $29,092, an increase of $9,567 over the low bid which Calblasco submitted in April 1972. This difference was

attributable to increased costs and increased deterioration during the 19-month interval between the date of submission of the bid and the date of trial. Camrosa made no effort to repair the tanks prior to trial. Southwest did not admit liability to make the repair until date of trial.

## DISCUSSION

 Southwest and General argue that as a matter of law Camrosa's damage cannot exceed Calblasco's low bid at the time the breach occurred and the cost which Camrosa would have incurred to make repairs at that time. Southwest and General argue that Camrosa had a duty to minimize the loss and make the repairs at the time the breach of warranty was discovered and that Camrosa could not collect the costs of such repairs as of the date of trial. Southwest and General conclude that the court's finding that Camrosa was entitled to $22,728 is not supported by the evidence. They argue that Camrosa was not entitled to more than $17,628,[2] and, that as a matter of law, this court should modify the judgment to reduce it to that figure. As far as it goes, the position of Southwest and General is based upon substantial authorities (*Valencia* v. *Shell Oil Co.,* 23 Cal.2d 840 [147 P.2d 558]; *Kitchel* v. *Acree,* 216 Cal.App.2d 119 [30 Cal.Rptr. 714]; *Sackett* v. *Spindler,* 248 Cal.App.2d 220 [56 Cal.Rptr. 435]; 14 Cal.Jur.2d 731, 732) which however are not controlling here. Camrosa acknowledges that it is under a "disability to recover for avoidable loss" (22 Am.Jur.2d, Damages, § 30, pp. 50-51) which could have been avoided by "exercising reasonable diligence and ordinary care" (*Guerrieri* v. *Severini,* 51 Cal.2d 12 [330 P.2d 635]), but contends that it was not under a duty to go to "extraordinary or unusual lengths to minimize damages" (*Guerrieri* v. *Severini, supra),* and that it is not obligated "to assume [and perform] the burden which the adverse wrongdoer has violated, nor to incur relatively large expenses on that account." (*Dutra* v. *Cabral,* 80 Cal.App.2d 114, 122 [181 P.2d 26]; see also *Gerwin* v. *Southeastern Cal. Assn. of Seventh Day Adventists,* 14 Cal.App.3d 209 [92 Cal.Rptr. 111].)

Camrosa further argues that Southwest and General had the burden of proving that Camrosa had the ability to lessen the actual damages incurred and that a person who is financially unable to make such expenditure is not required to do so (*Jordan* v. *Talbot,* 55 Cal.2d 597, 611

---

[2]The difference between $17,628 and Calblasco's low bid of $19,525 is attributable to a difference in the type of interior coating to be used. Southwest and General argue that the cheaper coating was just as effective.

[12 Cal.Rptr. 488, 361 P.2d 20, 6 A.L.R.3d 161].) Camrosa further argues that Southwest and General did not plead or prove that Camrosa violated a duty to minimize damage; that such a defense must be pleaded. (*Vitagraph, Inc.* v. *Liberty Theatres Co.,* 197 Cal. 694, 699 [242 P. 709]; *Hunter* v. *Croysdill,* 169 Cal.App.2d 307, 318 [337 P.2d 174].)

We are persuaded that Camrosa's position is the correct position. An injured party's duty is to *minimize* its loss. Here Southwest and General expect Camrosa to perform their entire contractual obligation. In our view, Southwest and General were guilty of two wrongs: (1) a breach of the warranty of quality, and (2) a continuing refusal to correct the defect. If Southwest and General had acknowledged their obligation to Camrosa in April of 1972, instead of denying it until December of 1973, their present claim that damages were erroneously computed, would have more merit and be more persuasive. By denying liability until date of trial, they placed Camrosa in a dilemma. Until the liability of Southwest and General was established by acknowledgement or judgment, Camrosa could not make an intelligent and informed decision on whether to proceed with the repair work until it knew who would pay the bill. It might well perform the repair work in April of 1972 if the bill would be paid by Southwest and General whereas it might be required to forego that repair work, for economic or other reasons, if Camrosa would be required to pay the bill. Southwest and General deprived Camrosa of that choice.

■ The law is well established that where a seller of personal property breaches a warranty of quality and refuses to correct the defect, the buyer is entitled to recover money and time spent in reasonable efforts to make defective goods conform to warranty. (*Roberts Distrib. Co.* v. *Kaye-Halbert Corp.,* 126 Cal.App. 664, 671 [272 P.2d 886]; *Seely* v. *White Motor Co.,* 63 Cal.2d 9, 14 [45 Cal.Rptr. 17, 403 P.2d 145].) In *Seely,* the Supreme Court said: "When, as here, the warrantor repeatedly fails to correct the defect as promised, it is liable for the breach of that promise as a warranty."

■ If as the foregoing authorities recognize, a buyer of personal property is entitled to recover the cost of repairing a defective condition to make the property conform to warranty, we see no reason why such buyer should be denied such recovery where, in a case of disputed liability, the buyer does not undertake the repair until resolution of the issue of liability.

In the case at bar, Calblasco submitted evidence that at the time of trial it would cost $29,092 to repair the damage to the water tanks and that this figure was the cost for repairing the damage that occurred during the warranty period (prior to Mar. 31, 1972) plus the cost of repairing the damage that occurred between the expiration of the warranty period and the time of trial. The trial court did not allow the $29,092 but allowed only $22,728 which would be the then cost of repairing the damage which had occurred prior to March 31, 1972. It is clear from the record that the difference between $19,525 (estimate in Apr. 1972) and the $22,728 (awarded at trial) was due to inflation that had occurred during that period. In *Seely, supra,* the buyer's effort at repair extended over an 11-month period and he was still permitted to recover such costs. Clearly, Camrosa is entitled to·be placed in the position that it would have been in if Southwest and General had performed their obligation *at the time* that they were required to perform it.

We note that in the case at bar, we are concerned not only with the normal contract of sale of personal property with an express warranty of quality, but also a bond issued by an insurance company guaranteeing that the seller will make good on its warranty of quality. ▪ Where a seller of personal property breaches a warranty of quality and *also* breaches a contract and bond to make good on that warranty and correct any defective condition we think that increased cost of repair at a future date due to the normal attrition resulting from the forces of inflation was a foreseeable consequence of the breach of the express promise to make good on the warranty. ▪ Southwest and General could reasonably foresee that a normal consequence of a breach of contract on their part to repair the defective condition in April of 1972, would be that costs of repair would continue to increase until liability was established by acknowledgement or judgment and the repairs were made either by the buyer or the seller. The increased cost caused by normal inflation was a reasonable and foreseeable consequence, naturally flowing from the continuing breach of the contract to repair.

▪ The law is clear that a buyer who suffers damages from a breach of warranty is entitled to consequential damages which are reasonable and foreseeable (2 Witkin, Summary of Cal. Law (8th ed.) Sales, § 188, p. 1227; *Chamberlain Co.* v. *Allis-Chalmers Co.,* 51 Cal.App.2d 520 [125 P.2d 113], 74 Cal.App.2d 941 [170 P.2d 85]).

We note further that the award of $22,728 was not substantially different from an award of $19,525 together with interest at 7 percent from January 31, 1972, to date of trial which would aggregate $22,100.[3] It is elemental that a plaintiff is entitled to recover interest where damages resulting from a breach of contract "are capable of being made certain by calculation." (Civ. Code, § 3287, subd. (a); 1 Witkin, Summary of Cal. Law (8th ed.) Contracts, § 654, p. 556; see also *Charlton* v. *Pan American World Airways,* 116 Cal.App.2d 550, 554 [254 P.2d 128].)

We conclude that the findings of the trial court that Camrosa sustained damage in the sum of $22,728 is supported by substantial evidence.

The judgment is affirmed.

Hastings, J., concurred.

Kaus, P. J., concurred in the result.

---

[3]According to our mathematics, there are 688 days between January 31, 1972, and December 20, 1973, and that daily interest at 7 percent on $19,525 would be $3.744 per day or a total of $2,575 interest.