MERIDIAN LEASING, INC., Plaintiff,

v.

ASSOCIATED AVIATION UNDERWRITERS, INC., Defendant.

Case No. 1:02–CV–192.

United States District Court, W.D. Michigan.

Jan. 6, 2004.

Jon R. Muth, Miller, Johnson, Snell & Cummiskey, PLC, Grand Rapids, MI, for plaintiff.

Barry R. Smith, Lewis, Reed & Allen, PC, Kalamazoo, MI, for defendant.

## OPINION

CARMODY, United States Magistrate Judge.

On August 22, 2002, the parties consented to the jurisdiction of this Court for all further proceedings, including trial and an order of final judgment. *See* 28 U.S.C. § 636(c)(1). On September 24, 2003, this Court conducted a bench trial in this matter. As articulated herein, the Court finds for Plaintiff as to Count I (breach of insurance contract) of the complaint and finds for Defendant as to Count II (breach of duty of good faith and fair dealing) of the complaint. With respect to Count I, the Court awards to Plaintiff $295,333.45 in damages as detailed below.

## FACTUAL FINDINGS

The following is a statement of relevant facts as determined by the trial in this matter, as well as the parties' pleadings. Additional facts will also be referenced in the analysis below.

1. In March of 2001, Plaintiff Meridian Leasing, Inc. ("Meridian") purchased a new aircraft, a Piper Malibu Meridian, PA–46–500TP, serial number 4697036 and registration number N767TP (the "Aircraft"). The aircraft was delivered to Plaintiff on April 2, 2001. (Dkt. # 60 at 4).

2. The aircraft is powered by a Pratt & Whitney PT6A–42A turbine engine, serial number PCE–RM0042 (the "Engine"). (Dkt. # 60 at 4).

3. The aircraft was insured under an insurance policy, No. GW409142, issued by Defendant Associated Aviation Underwriters, Inc. ("AAU") to Plaintiff, in effect from March 13, 2001, to March 13, 2002 (the "Policy"). (Dkt. # 60 at 4).

4. On August 10, 2001, James Robins ("Robins"), the owner of Meridian and the pilot of the aircraft, attempted to start the engine prior to undertaking a cross country flight. (Dkt. # 60 at 4).

5. Starting the engine involves a series of steps which initiates the burning of fuel inside the engine. (Dkt. # 60 at 4).

6. The aircraft is designed such that the engine exhaust exits through two exhaust stacks located in the nose of the aircraft. (Tesser Deposition at 17–24).

7. During the course of the start sequence, Robins observed visible flames emanating from both exhaust stacks. (Robins Trial Testimony).

8. Upon seeing these flames, Robins immediately began performing emergency shutdown procedures. (Robins Trial Testimony).

9. These procedures did not eliminate or extinguish the fire, at which point Robins made the decision to evacuate the aircraft. (Robins Trial Testimony).

10. David Tesser ("Tesser"), a mechanic inspector employed by Des Moines Flying Service, Inc., witnessed these events from a nearby hanger. (Tesser Deposition at 6–7, 60–66).

11. Upon seeing the flames emanating from the exhaust stacks, Tesser began running to the aircraft so as to help "get the fire put out." (Tesser Deposition at 66–67).

12. Tesser arrived at the aircraft as Robins was preparing to exit. (Tesser Deposition at 74–75; Robins Trial Testimony).

13. At Tesser's direction, both Tesser and Robins reentered the aircraft. (Tesser Deposition at 74–75; Robins Trial Testimony).

14. Once inside the aircraft, Tesser instructed Robins to restart the engine, after which the flames emanating from the exhaust stacks were extinguished. (Tesser Deposition at 75–85; Robins Trial Testimony).

15. Tesser subsequently reviewed data compiled by the aircraft's computer monitoring system during this occurrence. (Tesser Deposition at 85–87).

16. This information revealed that the aircraft's engine had (for several seconds) been operating in a temperature range beyond which the engine was designed to safely operate. (Tesser Deposition at 85–90).

17. After consulting with a representative of Pratt & Whitney, it was determined that the aircraft's engine would need to be removed from the aircraft and inspected by Pratt & Whitney. (Tesser Deposition at 91–92).

18. A subsequent examination of the engine by Pratt & Whitney revealed that the engine had suffered significant damaged as a result of excessive temperatures within the engine. (Plaintiff's Trial Exhibit # 5).

19. Pratt & Whitney repaired the engine at a cost of $224,165.53, which

was paid by Plaintiff. (Plaintiff's Trial Exhibit # 7).

20. Plaintiff also paid to Des Moines Flying Service, Inc. $8,326.36 for removal and reinstallation of the aircraft's engine. (Plaintiff's Trial Exhibit # 7).

21. While the aircraft engine was being repaired, Robins was forced to employ substitute transportation, the costs for which were $5,356.50. (Dkt. # 60 at 7).

22. Plaintiff subsequently filed with Defendant a claim under the policy for these amounts. (Dkt. # 60 at 7).

23. Defendant denied Plaintiff's claim. (Dkt. # 60 at 7).

24. Plaintiff subsequently initiated the present action in which it asserts two counts: (a) a claim for breach of the insurance contract, and (b) a claim for breach of the duty of good faith and fair dealing. (Dkt.# 1).

## ANALYSIS

### I. Choice of Law

The Court previously determined, in its February 14, 2003 Opinion, that California law was to be applied in this matter. Neither party has challenged this conclusion. Moreover, after reviewing its previous analysis on this issue the Court again concludes that California substantive law applies in this matter. The Court's previous analysis is nonetheless reiterated herein for the sake of thoroughness.

The Court has jurisdiction over the subject matter of the present dispute pursuant to diversity jurisdiction. *See* 28 U.S.C. § 1332. When presiding over a diversity action, federal courts must apply the substantive law of the state in which the court sits, including that state's choice of law rules. *See Mill's Pride, Inc. v. Continental Ins. Co.,* 300 F.3d 701, 704 (6th Cir.2002).

In *Chrysler v. Skyline Industrial Services, Inc.,* 448 Mich. 113, 528 N.W.2d 698 (1995), the Michigan Supreme Court addressed the issue of the choice of law rules applicable in contract disputes. While recognizing that the "predominant view in Michigan has been that a contract is to be construed according to the law of the place where the contract was entered into," the court noted that such a "rigid" approach was not always appropriate. *Id.* at 702–03. In this respect, the court indicated that sections 187 and 188 of the Second Restatement of Conflict of Laws, with its "emphasis on examining the relevant contacts and policies of the interested states, provide a sound basis for moving beyond formalism to an approach more in line with modern-day contracting realities." *Id.* at 703.

Accordingly, in the context of a contract dispute, Michigan choice of law rules require courts to examine the factors articulated in sections 187 and 188 the Second Restatement (and employed by the *Chrysler* court) so as to balance "the expectations of the parties to a contract with the interests of the states involved." *Mill's Pride,* 300 F.3d at 705 (recognizing that the *Chrysler* decision is the controlling authority in Michigan on choice of law issues involving contract disputes); *see also, Mitchell v. Travelers Property Casualty,* 2002 WL 31953815 at *1–2 (Mich.Ct. App., Dec.13, 2002) (same).

Section 187 of the Second Restatement of Conflict of Laws addresses the validity of contractual choice of law provisions. Because the insurance policy at issue in this case does not contain a choice of law provision, section 187 is not presently applicable. Section 188 of the Second Restatement provides as follows:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.[1]

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

■ The insurance policy was executed in California. The "producer" of the insurance policy (Marsh, Inc.) is a California resident. Moreover, while Meridian is a Nevada citizen, it obtained the insurance through an entity which is itself a California resident. This suggests, in the absence of evidence to the contrary, that the parties reasonably expected California law to be applied to any dispute regarding the meaning and interpretation of the policy's terms and provisions. Moreover, California certainly has an interest in having its laws applied to insurance contracts executed within its borders by California residents.

■ The only apparent connection which the state of Michigan has with this dispute is that it is a state in which Plaintiff was able to obtain personal jurisdiction over Defendant. This is an insufficient basis to overcome the factors noted above. *See, e.g., Sutherland v. Kennington Truck Service, Ltd.,* 454 Mich. 274, 562 N.W.2d 466, 472 (1997) (residence of the parties, "with nothing more, is insufficient to support the choice of a state's law") (citing *Home Ins. Co. v. Dick,* 281 U.S. 397, 408, 50 S.Ct. 338, 74 L.Ed. 926 (1930)).

After examining the relevant factors, the Court concludes that because California is the state which "has the most significant relationship to the transaction and the parties," its law should be applied in the present matter.[2]

---

1. Section 6 provides as follows:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

2. Defendant previously asserted that Michigan law should be applied in this matter, but the authority on which Defendant relied, *Sutherland v. Kennington Truck Service,* 454 Mich. 274, 562 N.W.2d 466 (1997), is inapplicable. The *Sutherland* court addressed the choice of law issue in the context of a tort action. *Id.* at 467–68. Moreover, in deciding the choice of law issue before it the *Sutherland* court expressly relied on *Olmstead v.*

## II. Interpretation of the Insurance Policy

The insurance policy at issue contains an "all risk" clause, under which Plaintiff filed its claim. Specifically, this provision provides as follows:

Coverage F—All Risk Basis. To pay for any physical damage loss to the aircraft, including disappearance of the aircraft.

The policy also articulates various coverage exclusions, one of which provides that the policy does not apply in the following circumstance:

Under Coverages F, G, and H, to physical damage

(ii) caused by and confined to (a) wear and tear, (b) deterioration or (c) mechanical or electrical breakdown or failure of equipment, components or accessories installed in the aircraft

unless such physical damage be coincident with and from the same cause as other loss covered by this policy.

The policy describes additional limitations applicable to claims filed pursuant to Coverage F. Specifically, the policy states that

With respect to damage to aircraft engines and auxiliary power units insured under this policy

(b) damage caused by heat which results from the operation, attempted operation or shutdown of the engine shall be considered to be "wear and tear."

Defendant denied Plaintiff's claim, asserting that it was excluded by the policy's "wear and tear" exclusion. (Plaintiff's Trial Exhibits # 10–11; Dkt. # 71). Specifically, Defendant's position is that the damage to the engine was caused by heat—not fire. Defendant further asserts that the circumstance which Robins faced on August 10, 2001, was neither unexpected nor an emergency, but was simply part of the normal operation or attempted operation of the aircraft. *Id.*

As articulated in its February 14, 2003 Opinion, the Court previously determined that the "wear and tear" exclusion articulated in the policy precludes coverage for only that damage which results from "normal" or "ordinary" usage of the aircraft. In light of Defendant's objection to this conclusion, the Court has reexamined its analysis of this issue. The Court has not located any authority, however, which undermines or calls into question its previous conclusion.

■ Under California law, insurance policies are contracts, *see Safeco Ins. Co. of America v. Robert S.*, 26 Cal.4th 758, 110 Cal.Rptr.2d 844, 28 P.3d 889, 893 (2001), and the interpretation thereof is a "judicial function" requiring the court to "make its own independent determination, absent conflicting extrinsic evidence." *Farmers Ins. Exchange v. Knopp*, 50 Cal. App.4th 1415, 58 Cal.Rptr.2d 331, 334 (1996).

■ The goal of contract interpretation is to determine and give effect to the mutual intention of the parties. *See Safeco*, 110 Cal.Rptr.2d 844, 28 P.3d at 893; *Farmers*, 58 Cal.Rptr.2d at 334. That intention is to be ascertained from the language of the contract. *See Fidelity & Deposit Co. v. Charter Oak Fire Ins. Co.*,

---

*Anderson*, 428 Mich. 1, 400 N.W.2d 292 (1987), itself a tort action choice of law decision. *Id.* at 467–72. Other courts have recognized that the choice of law analysis articulated by the *Sutherland* court applies to tort actions—not contract actions. *See Hall v. General Motors Corp.*, 229 Mich.App. 580, 582 N.W.2d 866, 868 (1998); *Roskam Baking Company v. Lanham Machinery Co., Inc.*, 71 F.Supp.2d 736, 744 n. 1 (W.D.Mich.1999).

66 Cal.App.4th 1080, 78 Cal.Rptr.2d 429, 433 (1998). Unless a word or provision is used by the parties "in a technical sense or a special meaning is given to [it] by usage," such is to be interpreted according to its "ordinary and popular sense." *Farmers*, 58 Cal.Rptr.2d at 334.

■ A policy provision is ambiguous, however, if it is susceptible to "two or more reasonable constructions." *Safeco*, 110 Cal.Rptr.2d 844, 28 P.3d at 893. Such ambiguities are resolved by interpreting the ambiguous provisions "in accordance with the objectively reasonable expectations of the insured." *Farmers*, 58 Cal. Rptr.2d at 335; *see also, Safeco*, 110 Cal. Rptr.2d 844, 28 P.3d at 893 ("ambiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations"). A party's reasonable expectation of coverage is a question of law. *See Farmers*, 58 Cal.Rptr.2d at 335. Only if this approach fails to resolve the ambiguity is the provision in question interpreted against the insurer. *Id.*

■ An insurance company can choose which risks it will insure and which it will not, and "coverage limitations set forth in a policy will be respected." *Fidelity*, 78 Cal.Rptr.2d at 432. Nevertheless, coverage clauses contained within an insurance policy are generally interpreted broadly, in favor of coverage, whereas coverage exclusions are interpreted narrowly. *See London v. Medical Underwriters of California*, 2001 WL 1250104 at *4 (Cal.Ct.App., Oct.19, 2001); *State Farm Fire & Casualty Co. v. Irasusta*, 1993 WL 393063 at *2 (N.D.Cal., Sep.28, 1993) (citing California law).

As previously noted, the insurance policy at issue excludes coverage for damage caused by "wear and tear." The policy further provides that "damage caused by heat which results from the operation, attempted operation or shutdown of the engine shall be considered to be 'wear and tear.'" The policy, however, does not define or articulate the scope of these provisions.

Defendant has consistently maintained that the aircraft engine was damaged by heat, not fire, which resulted from the normal operation or attempted operation of the aircraft. Defendant asserts that because the policy excludes coverage for wear and tear, including damage caused by heat, Plaintiff cannot recover on its claim. In other words, Defendant takes the position that the relevant policy provisions exclude coverage for *any* damage caused by heat.

Plaintiff asserts that the circumstance which resulted in the damage to the aircraft engine was not a normal occurrence. Plaintiff further asserts that the policy exclusion on which Defendant relies cannot be interpreted so broadly as to preclude coverage for any and all damage caused by heat, regardless of the cause and origin thereof. The Court agrees.

■ If Defendant had wanted to exclude coverage for *all* damage caused by heat, regardless of the source or cause thereof, it could have included such a provision in the policy. Defendant did not do so. Instead, the policy excludes coverage for "wear and tear," which includes "damage caused by heat which results from the operation, attempted operation or shutdown of the engine." In other words, the policy excludes coverage for damage caused by heat which results from (or is properly characterized as) "wear and tear."

■ The policy does not, however, define the phrase "wear and tear." Moreover, the policy does not indicate, either through language or usage, that the term "wear and tear" is to be defined or inter-

preted in a "technical" or "special" sense. Accordingly, the phrase "wear and tear" must be interpreted according to its "ordinary and popular" meaning. Such an interpretation, however, fails to support Defendant's position. In its ordinary and popular usage, the phrase "wear and tear" simply does not encompass any and all damage, but rather is limited to that damage which results from "normal" or "ordinary" usage. *See, e.g.,* Wordsmyth, *available at,* http://www.wordsmyth.net/live/home.php?script =search & matchent=wear + and + tear & matchtype=exact (last visited on December 30, 2003) (defining "wear and tear" as "deterioration or wear caused by *ordinary* use"); YourDictionary.com, *available at,* http://www.yourdictionary.com/ahd/w/w0070200.html (last visited on December 30, 2003) (defining "wear and tear" as "loss, damage or depreciation resulting from *ordinary* use and exposure"); Dictionary of Automotive Terms, *available at,* http://100megsfree4.com/dictionary/car-dicw.htm# WearAndTear (last visited on December 30, 2003). This definition of "wear and tear" is also consistent with Plaintiff's "reasonable expectations."

The Court concludes, therefore, that the "wear and tear" exclusion in the subject insurance policy precludes coverage for only that damage which results from "normal" or "ordinary" usage of the aircraft.

In addition to the authority and analysis articulated above, the Court also finds persuasive the analysis articulated in *Carlson Companies, Inc. v. Associated Aviation Underwriters,* 1989 WL 124372 (Minn.Ct. App., Oct.24, 1989). As the parties are well aware, the *Carlson* court interpreted identical policy language (in an AAU poli-

cy) and reached the same conclusion—the "wear and tear" exclusion applied to preclude coverage only as to damage caused by "normal" operation of the aircraft.[3]

Defendant takes issue with the Court's citation to *Carlson,* asserting that any reliance by this Court on *Carlson* is inappropriate, as *Carlson* is an unpublished decision. The Court wishes to make clear that its interpretation of the relevant policy provisions is in no way dependent upon the *Carlson* decision. As detailed above, the Court's analysis is based upon the application of controlling California law. Nonetheless, the Court finds it relevant that another court previously interpreted the very same policy language and reached the same conclusion.

### III. Application of the Insurance Policy to the Present Circumstance

 Having interpreted the relevant policy language, the Court must determine whether Plaintiff's claim was properly denied by Defendant. Plaintiff asserts that the damage to the aircraft engine resulted from "abnormal" events which resulted in engine damage beyond the scope of "wear and tear" as interpreted by the Court. Defendant, on the other hand, asserts that the events which lead to the engine's damage were "within the control of the pilot" and, furthermore, were "neither uncontrollable nor an emergency." The question before the Court, however, is not whether the events of August 10, 2001, constituted an emergency or were within the pilot's control. Instead, the relevant question is whether the damage to the aircraft's engine resulted from "wear and tear" caused by "normal" or "ordinary" usage of the aircraft. The evidence in this matter

---

**3.** The Court has found no California case so directly on point, nor apparently have the parties.

clearly reveals that the circumstances which produced the damage to the aircraft's engine were not "normal" or "ordinary."

David Tesser witnessed from a nearby hanger the events of August 10, 2001. (Tesser Deposition at 6–7, 60–62). Tesser testified that when Robins attempted to start the aircraft's engine a "fire" and an "excessive amount of smoke" began emanating from the exhaust stacks. *Id.* at 63–65. Tesser indicated that this was an "unusual" occurrence which he had never experienced. *Id.* at 69, 113. Tesser also testified that the damage suffered by the aircraft engine in this circumstance was unusual. *Id.* at 129–30.

Doug Nehls, customer service director for Des Moines Flying Service, Inc., also witnessed the events of August 10, 2001. (Nehls Deposition at 5–6). Nehls testified that during his 26 years in the field of aircraft maintenance he had witnessed a similar event on only one other occasion. *Id.* at 13. As Nehls described it, the circumstance which Robins experienced on August 10, 2001, was "extremely rare." *Id.* After reviewing the reports completed by Pratt & Whitney following its inspection and repair of the aircraft engine, Nehls testified that the damage inflicted on the aircraft engine did not result from "normal" use. *Id.* at 13–14.

Robert Scott, an experienced pilot who was formerly employed as the director of training for Piper Aircraft, testified that he had never experienced flames emanating from the exhaust stacks on startup. (Scott Deposition at 7–24, 73). He noted that such an occurrence was "not common." *Id.* at 73. Scott further testified that the damage to the aircraft engine was "absolutely ... not normal wear and tear." *Id.* at 70–71.

James Meyers, the training center manager for Simcom, the facility at which Rob-

ins received training (on three separate occasions) on how to safely operate his aircraft, testified that the circumstance which Robins encountered on August 10, 2001, was "abnormal." (Meyers Deposition at 5–10, 25, 40–41). David White, the Simcom trainer who actually supervised Robins' training, testified that the situation which Robins encountered on August 10, 2001, was neither normal nor ordinary. (White Deposition at 3–5, 17–18).

While Maurice Hovious, an experienced pilot and aircraft mechanic, testified that he had on "numerous occasions" experienced circumstances similar to that faced by Robins, Hovious nonetheless characterized such events as "not normal." (Hovious Deposition at 1–9, 19–20). Hovious further testified that given the extent of the damage to the aircraft engine such could not have resulted from normal or usual operation. *Id.* at 16–17.

Defendant goes to great lengths attempting to demonstrate that the situation which Robins faced was not an emergency and that it could have been easily controlled had Robins responded differently. First, whether the events of August 10, 2001, are properly characterized as an emergency is irrelevant. The exclusion provision on which Defendant relied in denying Plaintiff's claim does not exclude damage caused by non-emergencies, but rather excludes coverage for damage caused by wear and tear which results from the normal operation of the aircraft. As the evidence identified above reveals, the damage to the aircraft engine did not result from a normal or ordinary event.

■ Furthermore, whether Robins responded "appropriately" in this matter is likewise irrelevant. The exclusion provision on which Defendant relied in denying Plaintiff's claim does not exclude damage caused by pilot error, but rather excludes

coverage for damage caused by wear and tear which results from the normal operation of the aircraft. Again, as discussed above, the damage to the aircraft did not result from an ordinary or normal event. Even assuming, arguendo, that Robins' response to the extraordinary event was completely inappropriate, Defendant does not, and cannot, rely on a pilot error exclusion to coverage.

For the reasons discussed herein, the Court concludes that the events which transpired on August 10, 2001, immediately following Robins' attempt to start the aircraft engine, are not properly characterized as occurring in the course of "normal" or "ordinary" operation of the aircraft. The resulting damage to the aircraft engine, therefore, cannot be said to have resulted from "wear and tear," as that term is used in the insurance policy. Accordingly, Defendant breached its insurance contract with Plaintiff by improperly denying its claim. The Court, therefore, finds for Plaintiff as to Count I of Plaintiff's complaint.

## IV. Plaintiff's Bad Faith Claim

Plaintiff asserts that the decision by Defendant not to pay its policy claim was made in bad faith. Plaintiff asserts that it is, therefore, entitled to damages in tort, including the costs incurred in pursuing this matter.

■■■■ Under California law, all insurance contracts contain an implied covenant of good faith and fair dealing "requiring each party to the insurance contract to refrain from doing anything to injure the right of the other party to receive the benefit of the agreement." *Whitney v. California Fair Plan Assoc.*, 2003 WL 22923095 at *4 (Cal.Ct.App., Dec.11, 2003). An insurer violates this implied covenant, in other words acts in bad faith, where it refuses to "bestow policy benefits" without "proper cause." *Morris v. Paul Revere Life Ins. Co.*, 109 Cal.App.4th 966, 135 Cal.Rptr.2d 718, 723 (2003).

■■■■ Bad faith must be the result of "a conscious and deliberate act" and cannot be premised upon "an honest mistake, bad judgment or negligence." *Provident Life and Accident Ins. Co. v. Van Gemert*, 262 F.Supp.2d 1047, 1052 (C.D.Cal.2003) (interpreting California law). When resolving a claim that policy benefits were denied in bad faith, the insurer's subjective intent is irrelevant. *Morris*, 135 Cal. Rptr.2d at 723. It must also be remembered that the insurer is not a fiduciary and thus is under no obligation to consider the interests of its insured above its own. *Id.* Accordingly, an insurer is entitled "to argue for whatever interpretation of the law and policy language most benefit[s] its own interests," and so long as the insurer's actions are reasonable it cannot be said to have acted in bad faith. *Id.* at 723–24.

■■■■ Plaintiff's bad faith claim is premised upon the *Carlson* decision referenced above. Plaintiff asserts that Defendant acted in bad faith by failing "to promptly, fairly, and equitably settle a claim that the only court which had ever interpret[ed] the policy language said was a covered claim." In the Court's estimation, however, the issue is not so easily resolved.

As reflected by the present action, Plaintiff's policy claim essentially presented two related but nonetheless distinct issues: (a) the proper interpretation of the policy's "wear and tear" exclusion (i.e., whether the policy excluded coverage for any heat-related damage regardless of cause or origin), and (b) whether Plaintiff's claim was properly excluded under the wear and tear exclusion as interpreted.

With respect to the scope of the wear and tear exclusion, the *Carlson* decision is certainly on point and clearly supports

Plaintiff's position. The *Carlson* decision, however, while persuasive, is not controlling in this matter. Moreover, Defendant has identified authority which arguably supports its interpretation of the scope of the wear and tear exclusion. Furthermore, even had Defendant adopted the *Carlson* court's interpretation of the wear and tear exclusion, the facts of that case are distinguishable, as there the aircraft suffered damage of a different nature and magnitude that is the case presently. Thus, while the *Carlson* decision supports Plaintiff's position with respect to its underlying policy claim, Defendant's failure to consider it controlling in this matter is not unreasonable.

In short, while the Court found for Plaintiff on its underlying policy claim, Defendant's position to deny coverage was not, in the Court's estimation, unreasonable. Defendant interpreted the insurance contract differently than did Plaintiff. While the Court found Defendant's interpretation unpersuasive, its position was not so devoid of support as to be unreasonable or constitute bad faith. Accordingly, the Court finds for Defendant on Count II of Plaintiff's complaint.

## V. Damages

Having found for Plaintiff as to Count I of its complaint, the Court must calculate the amount in damages to which it is entitled. As discussed below, the Court concludes that Plaintiff is entitled to $295,333.45 in damages.

The cost to Plaintiff to repair the aircraft engine was $224,165.53. (Dkt. # 60 at 6; Plaintiff's Trial Exhibit # 6). Plaintiff was charged $8,326.36 to remove and reinstall the aircraft engine. (Dkt. # 60 at 7; Plaintiff's Trial Exhibit # 7). Plaintiff also incurred costs in the amount of $5,356.50 to purchase alternative transportation during the time which the air-

craft was inoperable. (Dkt. # 60 at 7). There has been no allegation that any of the amounts charged to Plaintiff is unreasonable. (Dkt. # 60 at 6–7). Plaintiff paid these costs and subsequently sought to recover such pursuant to the insurance policy at issue. It is these costs which Plaintiff seeks to recover pursuant to Count I of its complaint. These losses total $237,848.39. Finding such costs to be compensable under the insurance policy at issue, the Court awards to Plaintiff damages in the amount of $237,848.39.

Plaintiff also asserts that it is entitled to prejudgment interest on this amount. In a diversity action, issues regarding prejudgment interest are governed by the law of the state applicable in the underlying action. *See Truform Inc. v. General Motors Corp.,* 2003 WL 22718247 at *6 (6th Cir., Nov.17, 2003). Under California law, a party entitled to recover damages the amount of which is "certain, or capable of being made certain by calculation" is entitled to recover prejudgment interest from the time the right to recover arises. *See Cal. Civ.Code* § 3287; *North Oakland Medical Clinic v. Rogers,* 65 Cal.App.4th 824, 76 Cal.Rptr.2d 743, 745 (1998).

The damages claimed by (and awarded to) Plaintiff were "certain, or capable of being made certain by calculation" as of the date Plaintiff incurred them. *See Shell Oil Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 44 Cal.App.4th 1633, 52 Cal.Rptr.2d 580, 591 (1996). Interest on such damages is to be awarded from the date that such damages became certain through the date of judgment. *See Cal. Civ.Code* § 3287; *Camrosa County Water District v. Southwest Welding & Mfg. Co.,* 49 Cal.App.3d 951, 123 Cal.Rptr. 93, 94–96 (1975). California law further provides that in the absence of a contract

provision stipulating to the applicable interest rate, the Court shall calculate interest at the rate of 10 per cent per annum. *See Cal. Civ.Code* § 3289.

■ Having found appropriate the awarding of prejudgment interest, the Court must now calculate such. Plaintiff asserts, without rationale, that it is entitled to prejudgment interest on the damage award ($237,848.39) beginning on September 10, 2001. (Plaintiff's Trial Exhibit # 16). The Court disagrees. On September 28, 2001, Des Moines Flying Service, Inc. submitted to Plaintiff an invoice in the amount of $232,491.89. (Plaintiff's Trial Exhibit # 7). This amount represents (a) the $224,165.53 charged by Pratt & Whitney (to Des Moines Flying Service, Inc.) to repair the aircraft engine and (b) the $8,326.36 charged by Des Moines Flying Service, Inc. to remove and reinstall the aircraft engine. Thus, in the absence of evidence suggesting otherwise, the Court finds that these amounts did not become certain until September 28, 2001.

■ As for the $5,356.50 claimed by Plaintiff to purchase alternative transportation during the time which the aircraft was inoperable, Plaintiff has failed to submit any evidence identifying the specific dates on which such costs were incurred. However, considering that such costs were incurred during the time period that the aircraft was inoperable, it is reasonable to conclude that such costs were incurred between August 10, 2001, and September 28, 2001. Accordingly, the Court determines that prejudgment interest in this matter does not begin to run until September 28, 2001, and accumulates through January 5, 2004, the date of the Court's decision. Calculated at an interest rate of ten percent per annum, the interest earned on the damage award of $237,848.39 equals $57,485.06. Accordingly, Plaintiff is enti-

tled to an award of damages in the amount of $295,333.45.

■ Plaintiff also asserts that it is entitled to an award of attorney fees in this matter. However, because Plaintiff did not prevail on its bad faith claim, attorney fees are not recoverable. *See Brandt v. Standard Ins. Co.*, 37 Cal.3d 813, 815–19, 210 Cal.Rptr. 211, 693 P.2d 796 (1985) (recognizing that in the absence of bad faith, an insured cannot recover "attorney's fees incurred in obtaining benefits that the insurer erroneously, but in good faith, withheld from the insured"). Accordingly, the Court denies Plaintiff's request for attorney fees.

## CONCLUSION

As detailed herein, the Court finds for Plaintiff as to Count I of its complaint. With respect to Count II of Plaintiff's complaint, the Court finds for Defendant. Plaintiff is hereby awarded $295,333.45 in damages as detailed above.

A Judgment consistent with this Opinion will enter.

## JUDGMENT

Consistent with the Opinion entered this day:

1. The Court finds for Plaintiff as to Count I of its complaint.

2. With respect to Count II of Plaintiff's complaint, the Court finds for Defendant.

3. Plaintiff is hereby awarded $295,333.45 in damages.